1                                              1

2        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF NEW YORK
3        --------------------------x

4        STEVEN COOPER,

5                Plaintiff,

6                v.                17-CV-01517

7        CITY OF NEW YORK, et al.,

8                Defendants.

9        --------------------------x
                                 October 21, 2020
10                               2:08 p.m.

11

12

13

14             Videoconference deposition of

15       DESMOND MORALES, taken by the plaintiff,

16       pursuant to order, reported remotely by

17       Jennie Siolidis, a Shorthand Reporter and

18       Notary Public of the State of New York.

19

20

21

22

23

24

25

```
 1                                                2

 2        APPEARANCES (ALL REMOTE PARTICIPANTS):

 3

 4

 5        RICKNER, PLLC

 6             Attorney for plaintiff

 7             233 Broadway, Suite 2220

 8             New York, NY 10279

 9        BY:  ROB RICKNER

10             STEPHANIE PANOUSIERIS

11

12

13        JAMES E. JOHNSON

14        CORPORATION COUNSEL OF THE CITY OF NEW YORK

15             Attorney for defendants Jessica

16             Schrell, Brendan Ryan, Adam Katrincic,

17             Desmond Morales, Nicholas Horun, and

18             Pearl Barnhart

19             100 Church Street

20             New York, NY 10007

21        BY:  CHRISTOPHER D. DeLUCA

22

23

24

25
```

```
 1                                                    3
 2        APPEARANCES (CONTINUED):
 3
 4
 5        LAW OFFICE OF AARON M. GOLDSMITH, PC
 6              Attorney for defendant Daniel O'Connor
 7              225 Broadway, Suite 715
 8              New York, NY 10007
 9        BY:  AARON M. GOLDSMITH
10
11
12        KARASYK & MOSCHELLA, LLP
13              Attorney for defendant Thomas Jacobs
14              233 Broadway, Suite 2340
15              New York, NY 10279
16        BY:  JOHN BURNS
17
18
19
20
21
22
23
24
25
```

```
 1                      Morales                28
 2       with regard to that training?
 3            A.    No.
 4            Q.    Was this a class that you took at
 5       the academy?
 6            A.    When I became captain?
 7            Q.    Yes.
 8            A.    Yeah, there was a one-month
 9       training, but not necessarily so much
10       geared toward this.  Maybe there was a
11       one-hour block in the whole month; that's
12       about it.
13            Q.    Okay.  And what year did you go
14       through that training?
15            A.    I became a captain five years
16       ago.  It was October of 2015.
17            Q.    Now turning back to March 20th,
18       2016, when you arrived at the 90th
19       precinct, who is the first person involved
20       with the incident that you spoke with?
21            A.    Do you mean other members, or the
22       people involved, the parties involved?
23            Q.    Excluding people who may just
24       have been at the 90th precinct that you
25       would have spoken to, who was actually
```

```
 1                     Morales                29
 2       involved in the incident on the street did
 3       you speak to first?
 4            A.    Mr. Cooper.
 5            Q.    And how long did you speak with
 6       Mr. Cooper?
 7            A.    If I had to guess, approximately
 8       10, 15 minutes.
 9            Q.    Did you take any notes at this
10       interview?
11            A.    No.
12            Q.    Did you see any injuries on
13       Mr. Cooper?
14            A.    Not that I recall.
15            Q.    Do you remember seeing him with a
16       black eye?
17            A.    No.
18            Q.    If you had seen him with a black
19       eye, would you have made any record like an
20       aided report?
21            A.    I wouldn't have, but I would have
22       had one prepared by someone else.
23            Q.    Do you remember the sum and
24       substance of the conversation you had with
25       Mr. Cooper?
```

```
 1                        Morales              30
 2            A.    If I -- I just recall him saying
 3       he was punched.
 4            Q.    Did he say who punched him?
 5            A.    He said the lieutenant.
 6            Q.    Did you document that anywhere?
 7            A.    No, I didn't take any notes.
 8            Q.    Was anyone around when Mr. Cooper
 9       told you that the lieutenant had punched
10       him?
11            A.    No.  I believe it was just him
12       and I in the muster room of the precinct.
13       That's where you first walk in where the
14       police officers would have roll call, that
15       open space.  He was standing there.
16            Q.    And if I understand you
17       correctly, when you walked in, he was alone
18       in this muster room?
19            A.    Correct.  He was yelling at
20       somebody on the phone.
21            Q.    Did you hear the substance of
22       that phone call?
23            A.    Not really, no.  I wasn't paying
24       attention.
25            Q.    Was he in handcuffs?
```

1                    Morales                    31

2          A.    No.

3          Q.    And at that point was it your

4    understanding that he was under arrest?

5          A.    No.

6          Q.    Would he have been free to leave

7    the precinct at that time?

8          A.    Legally, yes.

9          Q.    Did he ask to leave the precinct?

10         A.    No.

11         Q.    Did he ask for medical attention?

12         A.    If I recall, the ambulance had

13   already come and he refused before I got

14   there.

15         Q.    Did you see anyone from EMS who

16   was still there at the 90th precinct when

17   you arrived?

18         A.    I don't remember.  I don't

19   recall.

20         Q.    When EMS arrives at a precinct,

21   is that recorded in the command log or a

22   similar document?

23         A.    Well, it would be recorded, if

24   they're a prisoner, it would be on a

25   medical treatment of prisoner form.  Or if

```
 1                     Morales              35

 2          A.     It's what you held up, right?

 3          Q.     Yes.

 4          A.     That was the UF49 prepared on the

 5     date in question.

 6          Q.     Okay.

 7                 Now, if I'm understanding your

 8     testimony correctly, you said that reading

 9     this helped you remember some of the things

10     that Mr. Cooper said to you; is that right?

11          A.     I believe so.

12          Q.     Can you please point me to the

13     portions of Exhibit 2 that you believe were

14     provided to you by Mr. Cooper?

15          A.     The third bullet four lines down,

16     "Upon arrival, they were met by Mr. Steven

17     Cooper, who stated he had been robbed by

18     four male whites in a car."

19          Q.     And you believe Mr. Cooper said

20     this to you, rather than it being relayed

21     to you by one of the other officers?

22          A.     No, I believe he said that to the

23     officers and that was -- that's kind of

24     what got the wheels in motion for me to go

25     there.
```

```
 1              Morales                    36
 2              I was under the impression that
 3     later, when I found out it was Lieutenant
 4     Jacobs and his group of people were
 5     assaulted and possibly robbed Mr. Cooper.
 6     So that sounds -- that's something I want
 7     to get there fast for.
 8         Q.    Understood.
 9              I want to be a little bit more
10     focused about my question, however.  Is
11     there anything else in Exhibit 2 that you
12     believe reflects something that Mr. Cooper
13     said to you, personally, rather than to
14     another officer or someone else?
15         A.    Just the part about being struck,
16     being punched.
17         Q.    Okay.  And just so we're clear,
18     that's the only part of the 10- to
19     15-minute conversation with Mr. Cooper in
20     the muster room that you remember?
21         A.    Yes.  I mean that -- the thing
22     that stands out is the thing that spells
23     out a possible crime, not the small little
24     nuances.
25         Q.    This isn't a memory test,
```

1                           Morales                    37

2          Captain.  You know, I only want what you

3          remember today.

4                A.    All I remember.

5                Q.    Exactly.

6                      Now, besides the conversation in

7          the muster room with Mr. Cooper, did you

8          ever speak to Mr. Cooper again on March

9          20th, 2016 or March 21st, 2016?

10               A.    No, never spoke to him ever

11         again.

12               Q.    Well, that's my next question.

13                     To be clear, have you ever spoken

14         to Mr. Cooper in any respect for any reason

15         following the March 20th, 2016 conversation

16         in the muster room?

17               A.    No.

18               Q.    After you spoke with Mr. Cooper,

19         who did you speak to next?

20               A.    I don't recall.  It could have

21         been Lieutenant Jacobs, it could have been

22         the supervisor on the desk, it could have

23         been Mr. Mona.  It could have been any of

24         them.  I don't recall the order.

25               Q.    Okay.  Who is the desk

```
 1                      Morales                    43

 2            A.    Not offhand, it doesn't ring a

 3      bell.

 4            Q.    That's Vasilios' -- the name he

 5      uses.

 6            A.    Oh, okay.

 7            Q.    Did you speak with Sergeant

 8      Katrincic prior to the recorded interview?

 9            A.    It would have been -- it sounds

10      appropriate for me to have, because I

11      believe he was a patrol supervisor, but I

12      don't recall conversations.  I don't even

13      know what he looks like.  I can't even

14      visualize the conversation.

15            Q.    What about officer Schrell, did

16      you have a conversation with her prior to

17      the recorded interview?

18            A.    Same answer.  I could have.  I

19      don't recall.

20            Q.    What about officer Horun?

21            A.    Same thing.  I could have.  I

22      don't recall.

23            Q.    At any time prior to the recorded

24      interviews did you tell Lieutenant Jacobs

25      that Mr. Cooper had accused him of punching
```

```
 1                    Morales              44
 2    him?
 3         A.    I don't recall if I said that to
 4    him.
 5         Q.    Okay.  Were you ever made aware
 6    of whether or not prior to the interviews
 7    Lieutenant Jacobs had been told that
 8    Mr. Cooper accused him of punching him?
 9              MR. DeLUCA:  Objection to form.
10         You can answer.
11         A.    I'd imagine so.  He was accused
12    of something, because he called his
13    representation, his union, so he had to
14    have been notified that there was an
15    allegation against him.  But I just don't
16    know if -- who that was; if that was me, if
17    that was the sergeant, if that was Borough
18    Investigations.  I don't recall who told
19    him, Lieutenant Jacobs.
20         Q.    Now, Exhibit 2 has a date on the
21    top, right, of March 20th, 2016?  Do you
22    see that?
23         A.    Yes.
24         Q.    Was this actually prepared on
25    March 20th, 2016?
```

1                        Morales                    45

2            A.    If it wasn't, it was prepared

3    right after midnight.

4            Q.    I will mention to you that the

5    interview with Lieutenant Jacobs occurred

6    after midnight, so would that mean that it

7    was prepared on March 21st, 2016?

8                 MR. DeLUCA:  Objection to form.

9            You can answer that.

10           A.    That would make sense.  It had to

11   have been after all the interviews were

12   concluded.

13           Q.    Would Exhibit 2 have been

14   prepared on March 22nd, or later?

15                 MR. DeLUCA:  Objection to form.

16           You can answer that.

17           A.    I'm going to be honest with you,

18   anything's possible.  But I doubt it went

19   that far, because Internal Affairs would be

20   looking for this, but I could not

21   definitively say what date.  I'd imagine it

22   was right after midnight, or at some point

23   after midnight.

24           Q.    Is it your general practice to

25   prepare these UF49s as close to the actual

1                          Morales                    46

2       interviews as possible?

3              A.     In a perfect world.

4              Q.     Now, prior to the recorded

5       interviews, did you discuss your

6       investigation with someone from the borough

7       investigation unit?

8              A.     Repeat that.  I'm sorry.

9              Q.     At some point -- let me just do

10      this a little easier.  At some point

11      someone from the borough investigation unit

12      arrived at the 90 precinct, right?

13             A.     Well, their unit, coincidentally,

14      is upstairs.  It's already in the building.

15             Q.     So it wouldn't have taken them

16      long to get there?

17             A.     If they were working.  It was a

18      Sunday.  They could have been on call and

19      then came in maybe hours later.

20             Q.     Well, stepping back for a second,

21      do you know when the borough investigation

22      unit arrived at the 90 precinct, whether

23      they were coming from upstairs or from

24      outside of the building?

25             A.     I don't know the exact time, but

1                        Morales                    47

2      I know it wasn't right away.

3           Q.    Would that have been recorded on

4      the command log?

5           A.    No.  That would be whenever they

6      went for duty, they signed in.

7           Q.    Did the borough investigation

8      unit officers have memo books?

9           A.    I don't believe so, because

10     they're considered investigators.  Only

11     patrol officers and patrol sergeants carry

12     them.

13          Q.    Do they carry notebooks or some

14     other way of recording information?

15          A.    Yeah, an unofficial steno pad,

16     something along that sort.

17          Q.    Did you have a conversation with

18     the borough investigation unit officers

19     prior to beginning the recorded interviews?

20          A.    Yes.

21          Q.    Can you tell me the sum and

22     substance of that conversation?

23          A.    It was probably just the

24     preliminary information that I received

25     from speaking to Mr. Cooper, talking to

```
1                     Morales                60
2          A.    Yeah, I don't see it anywhere.
3          Q.    Okay.
4                MR. RICKNER:  Let's take five?
5                (Whereupon, a short recess was
6          taken.)
7          Q.    Captain Morales, you good to go?
8          A.    Yes.
9          Q.    Okay.  Previously we established
10     that Exhibit 2 does not include a statement
11     that Steven Cooper was assaulted by
12     Lieutenant Jacobs, right?
13         A.    Yes.
14         Q.    Why wasn't that information
15     included?
16         A.    Because like we alluded to prior,
17     the 49 is done after the fact.  And after
18     the investigation was complete interviewing
19     the witnesses and Mr. -- well, Mr. Cooper
20     initially and the witnesses, it was
21     determined that Lieutenant Jacobs did not
22     strike Mr. Cooper, and Mr. O'Connor
23     actually struck him.
24         Q.    And how did you come to that
25     determination?
```

1                          Morales                    61

2              A.    That was the investigating

3        entities and all their interviews of the

4        witnesses and I guess their recorded

5        interviews.

6              Q.    I'd like you to turn to the

7        second page, and it's the last sentence

8        right above bullet 4 states, "A video

9        canvas yielded negative results at this

10       time."

11             A.    Mm-hmm.

12             Q.    How did you determine that a

13       video canvas yielded negative results?

14             A.    Well, in modern-day policing,

15       everything is recorded by big brother.

16       There's cameras almost everywhere.  So it's

17       pretty common procedure when almost

18       anything happens, you ask the police

19       officer, the sergeants, whoever is on the

20       scene to canvas, looking for any possible

21       video that may have recorded the incident.

22             Q.    And who performed that

23       investigation?

24             A.    What do you mean by that

25       investigation?

```
1                          Morales                    62
2            Q.    Well, if it's -- it says here a
3      video canvas yielded negative results,
4      right?
5            A.    Yes.
6            Q.    That would imply that a video
7      canvas took place, right?
8            A.    Correct, yes.
9            Q.    Who did the video canvas?
10           A.    I would not be able to tell you
11     that.  I have no idea.
12           Q.    Before putting this statement
13     into Exhibit 2, would you have spoken to at
14     least one officer who stated to you, I did
15     a video canvas?
16                 MR. DeLUCA:  Objection to form.
17           You can answer that.
18           A.    Not necessarily in that context.
19                 What could happen, or possibly
20     happened was me stating to a lieutenant
21     or -- well, there was no lieutenants
22     working that day.  Me stating to a
23     sergeant, make sure you do a video canvas;
24     make sure you check the vicinity to see if
25     anything was recorded or captured this
```

1                    Morales                      63

2        incident.  And then later on when I

3        inquired about the video camera, they said

4        yeah, we checked and we didn't find

5        anything.  That's how it could have went.

6            Q.    Okay.  But to be clear, you would

7        have spoken to somebody at some time prior

8        to Exhibit 2 being finalized to determine

9        whether or not the video canvas had been

10       done by some member of service, right?

11           A.    Correct.

12           Q.    And whoever that was told you

13       there were negative results?

14           A.    Either told me, or indirectly

15       told me.

16           Q.    How would they indirectly tell

17       you?

18           A.    They would tell the borough

19       investigations team that there were none,

20       and then it would be put on the 49.

21           Q.    Would the borough investigation

22       unit have done their own canvas for video?

23           A.    Possibly.

24           Q.    Now I'd like to turn to bullet

25       point No. 9.  At the bottom, it states that

```
1                    Morales              64

2        one of the people who was notified was PO,

3        and the last name is Tsourovakas,

4        T-s-o-u-r-o-v-a-k-a-s.  Do you see that?

5             A.    Yes.

6             Q.    And they are with DCPI; is that

7        right?

8             A.    Yeah, according to the 49.

9             Q.    What does DCPI handle?

10            A.    It stands for Deputy Commissioner

11       of Public Information.  That's -- they're

12       notified if they believe any incident is

13       possibly newsworthy.

14            Q.    So is it fair to say they were

15       notified because the incident on March

16       20th, 2016 could be newsworthy?

17            A.    Yes.

18            Q.    What about this incident made it

19       newsworthy?

20            A.    Well, two things.  One, it

21       involved Mr. O'Connor who is a -- or was a

22       rap artist.  And it also involved a member

23       of the service which, at times, is

24       newsworthy.

25            Q.    So it would be correct to state
```

1              Morales                    68

2         that helps anyone at all.  Can you

3         please mark this, Miss Court Reporter

4         as Exhibit 3?

5              (Whereupon, the supervisor's

6         fitness for duty report with the Bates

7         stamp D_00080 was marked as Exhibit 3

8         for identification as of this date by

9         the Reporter.)

10        Q.    Can you identify Exhibit 3 for

11   the record?

12        A.    Are you talking to me?

13        Q.    Yes, please.

14        A.    Oh okay.  "Supervisor's fitness

15   for duty report."

16        Q.    And can you look at the bottom

17   and tell me whether or not you signed it?

18        A.    Which one?  There's two.

19        Q.    Oh, that's interesting.  I see

20   one page with a shield on the top and a

21   Bates stamp on the bottom.  Is there a

22   second page?

23        A.    The one that says D_00080 on the

24   bottom or D0 --

25        Q.    That's the one.

1                         Morales                    69

2          A.     Well, it's -- and then there's

3     00079.  The sheets are actually the size of

4     half a sheet of paper.  Whoever scanned

5     them, scanned them two together onto one

6     sheet.

7                MR. RICKNER:  Okay.  I would then

8          ask.

9     The court reporter, and I think I may have

10         actually attached this document to the

11         wrong -- I think it was actually

12         attached to Exhibit 2.  So if you can

13         carve off 79 and 80 and let's just mark

14         them as one exhibit?

15         Q.     Now, looking at those two pages

16    Captain Morales, let's start with 79.

17         A.     Okay.

18         Q.     And I'll call it the first page

19    of Exhibit 3, Bates stamp D79.  Can you

20    identify this page for the record?

21         A.     Supervisor's fitness for duty

22    report.

23         Q.     And what is a supervisor's

24    fitness for duty report?

25         A.     These are prepared when there's

Morales                    70

1

2        an off-duty incident to basically document

3        their demeanor, their -- if they're

4        intoxicated, if they're combative, if

5        they're cooperative.  I guess, you know, to

6        basically record their physical condition

7        at the time of occurrence.

8            Q.    And this is based on your

9        personal observations?

10           A.    Well, in the police department's

11       procedure, they're actually done twice.

12       They're done by the initial supervisor who

13       first has the interaction with the subject;

14       and then later on it's by the second

15       supervisor, in this case the duty captain,

16       to basically see the condition of the

17       person, you know -- well, for two reasons.

18       One, for a police officer, say, if they're

19       intoxicated, it's on the observation of two

20       independent supervisors.

21            Now, the second prong for this,

22       the reason why they do that is many times

23       the duty captain responds maybe an hour or

24       an hour and-a-half later and the person

25       sobered up, so it's documenting their

```
 1                    Morales                71
 2        physical condition when the incident
 3        occurred and then later on.
 4             Q.    Now, the page marked 79, that was
 5        filled out by Sergeant Katrincic; is that
 6        correct?
 7             A.    It's signed by him.  It appears
 8        so.
 9             Q.    And is this a form that's filled
10        out in the regular course of the NYPD's
11        business when there's an incident involving
12        a member of service?
13             A.    When they're off duty, yes.
14             Q.    And is it necessary to ensure
15        that the information on this form is
16        accurate?
17             A.    Of course.
18             Q.    Is this form used potentially in
19        a disciplinary action?
20             A.    Yes.
21             Q.    Do officers receive training
22        regarding ensuring that this form is filled
23        out accurately?
24             A.    Do they get training?
25             Q.    Yeah.
```

1                    Morales                    72

2          A.     Not specifically for this report.

3     I mean some supervisors can go their whole

4     career never having to do it.

5          Q.     Okay.  And the second page of

6     Exhibit 3 bears Bates number 80, was this

7     filled out by you?

8          A.     The bottom -- the pertinent boxes

9     are.  The top, that doesn't look like my

10    handwriting.

11         Q.     What about there's a line that

12    says, "Supervisor's observation."  Do you

13    see that?

14         A.     Yeah.

15         Q.     It's about halfway down the page?

16         A.     Yeah I see it.

17         Q.     On the second page of Exhibit 3,

18    is that area below the line that says,

19    "supervisor's observation" your

20    handwriting?

21         A.     That is, yes.

22         Q.     Now I'd like to go to the top.

23    There's a section that says, "narrative

24    description as provided by complainant."

25    Do you see that?

```
 1                        Morales                    73

 2            A.    I see it.

 3            Q.    Now this appears to be blank.  Is

 4      that fair to say?

 5            A.    Yes.

 6            Q.    Should it have been filled out?

 7            A.    No.  This isn't -- the point of

 8      that would be if Mr. Cooper had some kind

 9      of accusation of Lieutenant Thomas's

10      fitness for duty, like if he claimed he was

11      drunk, if he claimed he was intoxicated,

12      just an accusation of a crime or something

13      like that wouldn't go on there.

14            Q.    Now, going to the bottom half,

15      there are a series of check marks; is that

16      correct?

17            A.    Yes.

18            Q.    Now, while filling out this form,

19      are you supposed to check off any

20      description that's applicable to the

21      officer that's being evaluated?

22            A.    Correct, yes.

23            Q.    And, for example, there's a

24      section odor of alcohol on breath and it

25      says, "None."
```

```
 1                         Morales              74

 2          A.    Yes, correct.

 3          Q.    Then it goes down to the eyes, it

 4    says, "apparently normal," for example?

 5          A.    Yes.

 6          Q.    And there's a section that says,

 7    "Member's armed status."  Do you see that?

 8          A.    Yes.

 9          Q.    Neither armed nor unarmed are

10    checked off; is that correct?

11          A.    Yeah, I see that.  And then the

12    next box, that was probably an oversight.

13          Q.    Okay.  So this statement that he

14    was armed or unarmed should have been

15    filled out, but was not?

16          A.    Correct.

17          Q.    And what about underneath it, the

18    "fit for duty or unfit for duty?"

19          A.    That was an oversight that should

20    have been, "fit for duty."

21          Q.    Was Lieutenant Jacobs armed?

22          A.    No, he wasn't.

23          Q.    How did you determine that?

24          A.    Well, when that happens, an

25    off-duty incident, you ask them.
```