1                                                      1

2          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
3          -------------------------X

4          STEVEN COOPER,

5                       Plaintiff,
                                        Case No.:
6              -against-               17-cv-01517

7          CITY OF NEW YORK, et al,

8                       Defendants.

9          -------------------------X
                                   November 4, 2019
10                                  3:07 p.m.

11

12

13

14              Videoconference deposition of SEAN

15      HUGHES, taken by the Plaintiff, pursuant to

16      a Court Order and to the Federal Rules of

17      Civil Procedure, reported remotely by Rose

18      Marie Iacobellis, a Shorthand Reporter and

19      Notary Public of the State of New York.

20

21

22

23

24

25

```
 1                                                        2

 2           APPEARANCES (ALL REMOTE PARTICIPANTS):

 3

 4           RICKNER, PLLC

 5                 Attorneys for Plaintiff

 6                 233 Broadway, 2220

 7                 New York, New York

 8           BY:  ROB RICKNER, ESQ.

 9

10           JAMES E. JOHNSON, ESQ.

11           CORPORATION COUNSEL OF

12           THE CITY OF NEW YORK

13                 Attorneys for Defendant

14                 City of New York

15                 100 Church Street

16                 New York, New York 10007

17           BY:  CHRISTOPHER DeLUCA, ESQ.

18

19           AARON M. GOLDSMITH, ESQ.

20                 Attorneys for Defendant

21                 Daniel O'Connor

22                 225 Broadway, Suite 715

23                 New York, New York 10007

24

25
```

```
1                                                    3

2         APPEARANCES (CONTINUED):

3

4         KARASYK & MOSCHELLA, LLP

5              Attorneys for the Defendant

6              Thomas Jacobs

7              233 Broadway, Suite 2340

8              New York, New York 10279

9         BY:  JAMES M. MOSCHELLA, ESQ.

10

11        KINGS COUNTY DISTRICT ATTORNEY'S OFFICE

12             Attorney for Sean Hughes, ADA

13             350 Jay Street

14             Brooklyn, New York 11201

15        BY:  JOHN CARROLL, ADA

16

17        PRESENT:

18        YITZCHOK KOTKES

19

20

21

22

23

24

25
```

1                                                      4

2                       STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND AGREED, by

5     and between counsel for the respective

6     parties hereto, that all objections, except

7     as to form, are reserved to the time of

8     trial.

9            IT IS FURTHER STIPULATED AND AGREED

10    that the deposition may be signed and sworn

11    to before any officer authorized to

12    administer an oath.

13           IT IS FURTHER STIPULATED AND AGREED

14    that the sealing and filing of the

15    deposition be waived.

16

17

18

19

20

21

22

23

24

25

```
 1                    Hughes              5

 2     SEAN HUGHES,

 3          called as a witness, having been first

 4          duly sworn by a Notary Public of the

 5          State of New York, was examined and

 6          testified as follows:

 7     EXAMINATION

 8     BY MR. RICKNER:

 9          Q.    Please state your name for the

10     record.

11          A.    Sean Hughes.

12          Q.    What is your address?

13          A.    350 Jay Street, Brooklyn, New

14     York.

15          Q.    ADA Hughes, my name is Rob

16     Rickner, I represent the Plaintiff, Steven

17     Cooper, in this action, and I'd just like

18     to you ask you a couple of questions.

19               Mr. Hughes, have you ever had

20     your deposition taken before?

21          A.    No.

22          Q.    Have you ever testified at trial?

23          A.    No.

24          Q.    Have you ever taken a deposition

25     given that you are an attorney?
```

```
 1                        Hughes                    6

 2        A.     No.

 3        Q.     Okay.

 4               I'm sure your attorney went over

 5        this, but these are just a couple of ground

 6        rules to help us get a nice clear

 7        transcript.

 8                    The first, and you're doing a

 9        great job of it, is please wait until my

10        rambling question finishes, even if you're

11        absolutely sure where I'm going, before you

12        jump in and answer, so there's a nice clear

13        break between what I say and you say, and

14        so that your attorney has a chance to

15        object.

16                    Do you understand?

17        A.     Yes.

18        Q.     Can you do that for me?

19        A.     Yes.

20        Q.     And even though we're testifying

21        here over Zoom, in our office, these are --

22        the same rules apply as if you're

23        testifying in a court of law, meaning that

24        you have to tell the truth, the whole truth

25        and nothing but the truth.  Do you
```

```
 1                    Hughes                    7
 2       understand?
 3             A.     I do.
 4             Q.     Will you do that for me?
 5             A.     Yes.
 6             Q.     And, finally, the last thing is
 7       that even though we are on Zoom, and you
 8       can see my hands and we can all make
 9       gestures and nod our heads, the court
10       reporter cannot necessarily take that down.
11       So we need nice, clear verbal answers.  Do
12       you understand?
13             A.     I do.
14             Q.     You're currently employed with
15       the Kings County District Attorney's
16       Office?
17             A.     Yes.
18             Q.     When did you start there?
19             A.     I started in the fall of 2015.
20             Q.     And did you start there right out
21       of law school?
22             A.     Yes.
23             Q.     Now, I'd like you to pull up the
24       complaint room screening sheet that I've,
25       hopefully, has already been provided to
```

```
1                          Hughes              8
2        you.  It bears the Bates number, D_00119 to
3        120.
4             A.    Yes, I'm looking at it.
5             Q.    Okay.
6             Can you --
7             MR. RICKNER:  And I'd like the
8             court reporter to please mark this as
9             Exhibit 27.  We're using sequential
10            exhibits.
11                 (Whereupon, the aforementioned
12            complaint room screening sheet, Bates
13            number, D_00119 to 120, was marked as
14            Exhibit 27 for identification as of
15            this date by the Reporter.)
16            Q.    Can you please identify Exhibit
17       27 for the record, Mr. Hughes.
18            A.    This is a complaint room
19       screening sheet.  The defendant's name in
20       this case was Steven Cooper, and the
21       screener is listed as myself, Sean Hughes.
22            Q.    Now, what is the complaint room?
23            A.    The complaint room is -- it's
24       part of the early case assessment bureau.
25       We -- when you're assigned there, you
```

```
 1                        Hughes                    9

 2        intake cases from the police and draft the

 3        first, you know, accusatory instrument.

 4             Q.    And what is the early case

 5        assessment bureau?

 6             A.    Principally, we screen the case,

 7        we call the -- we're usually the first

 8        people to call the witness, we write up

 9        some preliminary paperwork, we write a

10        criminal court complaint.  We also staff

11        the criminal court arraignments.

12             Q.    So please explain to me the

13        intake procedure in March or April of 2016

14        for a case with a DAT?

15             A.    So, there's a -- I wouldn't call

16        her specifically a chief, but there's a

17        woman who is in charge of the desk

18        appearance tickets, and they kind of just

19        sit in a stack.

20                  DATs aren't the same priority as

21        a live arrest case.  So because the person

22        is not in custody, so you kind of take the

23        DAT, like you pick it up to write it up

24        when there's not as many cases on the desk

25        to write it live.
```

1           Hughes                    10

2           In a case -- a certain DAT is

3    assault DATs, those were assigned to an ADA

4    to work on not just on one shift, but if it

5    needed to be, across a few shifts.

6        Q.    So the woman in charge, what's

7    her name?

8        A.    Her name is Sofia, S-O-F-I-A,

9    Aitken, A-I-T-K-E-N.

10       Q.    And would it be correct to say

11   that she has a collection of desk

12   appearance tickets that need to be

13   processed that she then distributes?

14       A.    I mean, I -- when you say

15   distribute, like she doesn't assign

16   anything, she is not an ADA, she's kind of

17   like a paralegal.  But I feel like she does

18   process them, I suppose, in the sense that

19   she, I don't know, maybe collects

20   paperwork, I couldn't specifically say what

21   she does.  But I know she's like the point

22   person of DATs.

23       Q.    Right.  So let me put it another

24   way.

25           How do you get assigned to a

1                              Hughes                    11

2       specific DAT?

3              A.    On a non-assault DAT, there's

4       like a box and you walk over and you pick

5       it up.

6              Q.    So the next one up is yours?

7              A.    Well, the DATs, actually, you can

8       kind of just go through the box, because

9       sometimes, you know, if you're looking for

10      something that might be a little easier as

11      a DAT to write up versus something that

12      might be a little more -- take a little

13      more time.

14             Q.    Okay.

15             So looking at the complaint room

16      screening sheet that was marked as Exhibit

17      27, is this an assault DAT?

18             A.    This was an assault DAT.

19             Q.    How are assault DATs assigned?

20             A.    I don't recall the specific

21      procedure, but I know that we were given --

22      like an assault DAT was assigned to me as

23      it was assigned to my colleagues, and I

24      would be, you know, charged with writing it

25      up and packaging it up and submitting it

```
 1                      Hughes              12

 2       off to eventually be arraigned.

 3            Q.    Do you know how you got assigned

 4       to Mr. Cooper's case?

 5            A.    I don't recall.

 6            MR. CARROLL:  Mr. Rickner, can I

 7            just jump in here?  I'm having a hard

 8            time pulling up the documents that you

 9            sent over.  Is there -- could you send

10            them to my personal e-mail address?

11            MR. RICKNER:  Yeah, absolutely.

12            What is it?  Oh, you e-mailed it to me

13            earlier, didn't you?

14            MR. CARROLL:  Yes, I did.

15            MR. RICKNER:  All right.  So I'm

16            going to just see if I can figure this

17            out really quickly.

18                 Off the record.

19                 (Whereupon, an off-the-record

20            discussion was held.)

21            Q.    When an assault --

22            MR. RICKNER:  Withdrawn.

23            Q.    DAT stands for desk appearance

24       ticket?

25            A.    Yes.
```

Hughes                    13

1

2      Q.    And a desk appearance ticket is

3    something that's provided to a criminal

4    defendant or a potential criminal

5    defendant, rather than processing them

6    through Central Booking?

7      A.    Yes.

8      Q.    When you were assigned an assault

9    DAT, how does the information you need to

10   process come to you?

11         MR. CARROLL:  Objection to the

12         form.

13     Q.    And to be specific, how does it

14   come to you in March 20th or April 20th of

15   2016?

16         MR. CARROLL:  Objection to the

17         form.  I just don't know what you mean

18         by "come to you."

19         MR. RICKNER:  Okay.  Let me

20         rephrase.

21     Q.    Is it correct to say that in

22   order to process a DAT, you need materials,

23   right?

24     A.    Yes.

25     Q.    And those materials, at least

1                          Hughes                    14

2      initially, are provided by the NYPD to the

3      Kings County District Attorney's Office?

4          A.    Yes.

5          Q.    And is there a name for the

6      package of materials that comes from the

7      New York City Police Department to the

8      Kings County District Attorney's Office?

9          A.    I've always just called it the

10     arrest packet, but I know it goes

11     through -- it's called LAPS, L-A-P-S.

12         Q.    Do you know what LAPS stands for?

13         A.    I think it's local arrest

14     processing something.

15         Q.    Fair enough.

16         A.    I think arrest processing is

17     definitely part of it.

18         Q.    What does LAPS do?

19         A.    Well, the LAPS is staffed by the

20     NYPD.  They get the paperwork from the

21     arresting officer, and then give the case a

22     ready time.  Then that's brought over to

23     the ECAB expediter.

24         Q.    And who is the ECAB expediter?

25         A.    As their role or specifically the

```
 1                        Hughes                    15
 2      person?
 3           Q.     As their role.
 4           A.     An ECAB expediter assigns live
 5      cases.
 6           Q.     But for a desk appearance ticket,
 7      which I gathered is not considered a live
 8      case; is that right?
 9           A.     That's correct.
10           Q.     When a potential criminal
11      defendant gets a desk appearance ticket,
12      how do the materials get from LAPS to the
13      district attorney who ultimately processes
14      it?
15           A.     I mean, someone puts them into a
16      yellow envelope, and they end up in the DAT
17      box, and then one of us picks it up.
18           Q.     Okay.
19                  So for an arrest --
20                  MR. RICKNER:  Withdrawn.
21           Q.     For an arrest DAT, like the one
22      depicted on Exhibit 27, you get a yellow
23      envelope?
24           A.     Yeah, it's a DAT packet.
25           Q.     Okay.
```

```
1                          Hughes                    16

2              Can you pull up this,

3      unfortunately, very fuzzy-looking exhibit,

4      Bates Stamped D_00116?

5              A.    I'm looking at that.

6              MR. RICKNER:  Can we please mark

7              this as Exhibit 28.

8              (Whereupon, the aforementioned

9              document Bates Stamped D_00116 was

10             marked as Exhibit 28 for identification

11             as of this date by the Reporter.)

12             Q.    Can you identify Exhibit 28 for

13     the record.

14             A.    That is a copy of a piece of

15     paper titled "DAT Arrest Package" with the

16     Defendant's name as Steven Cooper.

17             Q.    Now, when you were talking about

18     the yellow envelope that has the arrest

19     packet, does Exhibit 28 show up on the

20     front of that envelope?

21             A.    It's usually -- on DAT cases,

22     something like this would be stapled to the

23     front of the manilla envelope.

24             Q.    And inside of that envelope, what

25     materials would be included for an arrest
```

```
 1                     Hughes                17
 2   DAT?
 3             MR. CARROLL:  Objection to the
 4         form.
 5             MR. RICKNER:  Withdrawn.  You're
 6         right.
 7         Q.    What would be inside the DAT
 8   package yellow envelope in an assault DAT
 9   case?
10         A.    Honestly, it depends on the
11   arresting officer.  Generally speaking,
12   based on my experience, you would get an
13   OmniForm arrest report, an OmniForm
14   complaint report, maybe a complainant's
15   contact sheet.
16             Sometimes you can get vouchers
17   related to weapons or personal property,
18   narcotics.  Sometimes you can get a VSA
19   super form, maybe a memo book, a copy of a
20   memo book.  But, again, it depends on your
21   arresting officer.
22         Q.    What is a BSA super form?
23         A.    V -- as in Victor -- SA super
24   form.
25         Q.    Okay.
```

```
 1                     Hughes                18
 2          A.     Honestly, it says the defendant's
 3     name and has the officer's name on it, too,
 4     with their tax ID number.  And I have never
 5     figured out what purpose it serves.
 6          Q.     Understood.
 7                 Would you get mugshots sometimes
 8     as part of the DAT package?
 9          A.     What do you mean when you say a
10     "mugshot"?
11          Q.     A mugshot of the defendant.
12                 MR. CARROLL:  Objection to the
13          form.
14                 MR. RICKNER:  Would you like me
15          to start over or is there a specific
16          issue --
17                 MR. CARROLL:  What do you mean by
18          "mugshot"?  It could mean different
19          things.
20          Q.     ADA Hughes, when somebody is
21     arrested by the NYPD, is the protocol to
22     take a photograph of the person who was
23     arrested?
24          A.     It is.
25          Q.     Is that photograph often referred
```

1                      Hughes                    19

2      to as a "mugshot"?

3                MR. CARROLL:  Objection to the

4          form.

5           Q.    Is that -- what would you call

6      the photo that was taken by the NYPD?

7           A.    It kind of depends on who we're

8      talking about, because a mugshot, as I

9      know, it gets taken at bookings, at the

10     courthouse, and then it gets uploaded to

11     e-Justice, and we have to review, request

12     it, but that's usually after you get the

13     case.

14                But then sometimes your arresting

15     officer, as part of arrest protocol, may

16     take a full-body shot, frontal profile view

17     on their department phones when someone's

18     back in the pens at the precinct, and then

19     you also collect that as part of discovery.

20     That usually you don't get at the DAT

21     stage, though.

22          Q.    You mean that you would get that

23     once the case is already underway after

24     arraignment?

25          A.    Yeah, that's usually -- it's --

```
 1                        Hughes                    20
 2      it's usually not in the DAT packet
 3      pre-arraignment.  That's something the
 4      assigned usually has to collect.
 5           Q.    After you get an assault DAT
 6      packet, would you collect additional
 7      documents as part of processing the DAT?
 8           A.    I think it would depend.  I don't
 9      think I ever did.  I mean, because at that
10      point, you're -- you really just need
11      enough information to draft a sufficient
12      accusatory instrument.
13           Q.    So going back to Exhibit 27.
14           A.    That was the screen sheet,
15      correct.
16           Q.    Yeah, the screen sheet.
17           A.    Okay.
18           Q.    It says the screener is Sean
19      Hughes.  That's you, right?
20           A.    Yes.
21           Q.    Were you the only DAT --
22                MR. RICKNER:  Withdrawn.
23           Q.    Were you the only ADA that
24      processed Mr. Cooper's DAT?
25                MR. CARROLL:  Objection to the
```

1                        Hughes                    21

2              form.

3                    You can answer.

4                    I just don't know what you mean

5              by "process."

6                    MR. RICKNER:  He's been using the

7              word process.

8         Q.    All right.  Let's go back.

9                    ADA Hughes, is there a name for

10        the process by which a DAT package

11        ultimately becomes a signed criminal

12        complaint that's submitted?

13        A.    It's called screening.

14        Q.    Okay.

15                   Did any other ADA besides

16        yourself work on screening Mr. Cooper's

17        DAT?

18        A.    Do you mean at my level or

19        whether I consulted anybody?

20        Q.    Both.

21        A.    I was solely responsible for

22        screening this case, but before I'm allowed

23        to submit it, it had to be signed off on by

24        a supervisor.

25        Q.    At the time, who was your

```
 1                          Hughes              22

 2        supervisor?

 3             A.    It would depend on the day of the

 4        week.  My shift -- we had eight supervisors

 5        in ECAB, I think, at that time.

 6             Q.    When a complaint room --

 7             MR. RICKNER:  Withdrawn.

 8             Q.    When you're done screening a DAT,

 9        how would you go about having it approved

10        by your supervisor?

11             A.    You take the screening sheet and

12        the complaint unsigned to the boss, and you

13        sit down and you say this is a case, they

14        read it.

15                   If they have any questions, they

16        might ask you a few questions.  They might

17        ask you to find out some more information.

18        But if it's okay, then they initial it, and

19        then you're allowed to submit it.

20             Q.    Now, it says here the screening

21        date was April 20th, 2016; is that right?

22             A.    That is what the document says.

23             Q.    Is that the date that you

24        finished screening Mr. Cooper's DAT?

25             A.    I don't know.
```

1                          Hughes                    23

2           Q.     Would it be correct that for an

3      assault DAT, you may end up working on it

4      over multiple days?

5           A.     Yes.

6           Q.     Now, I'd like you to pull up the

7      complaint room tracking sheet?

8           A.     I'm looking at it.

9           MR. RICKNER:  I'd just like to

10          mark this as Exhibit 29.

11               (Whereupon, the aforementioned

12          complaint room tracking sheet was

13          marked as Exhibit 29 for identification

14          as of this date by the Reporter.)

15          Q.     Can you please identify Exhibit

16     29 for the record.

17          A.     At the top, it says, "Crimes

18     against persons DAT complaint room tracking

19     sheet."  It bears the name next to

20     defendant, "Cooper, Steven."  Further down,

21     it says, "Assigned ADA/Para Hughes and CW

22     Thomas Jacobs."

23          Q.     And what is the purpose of

24     Exhibit 29?

25          A.     It's kind of like an action

```
 1                    Hughes                24
 2       sheet, so that you can write down what you
 3       did.
 4            Q.    Now, I'd just like to go to the
 5       first line underneath the section,
 6       "Attempts to contact CW," do you see that?
 7            A.    Okay.
 8                  I see it.
 9            Q.    Now, "CW" means complaining
10       witness; is that right?
11            A.    Yes.
12            Q.    What is a complaining witness?
13            A.    A complaining witness is a person
14       who alleges that a crime was committed
15       against them.
16            Q.    Now, can you please read the
17       first entry underneath "attempts to contact
18       CW"?
19            A.    Under date, it says 4/16 -- I'm
20       sorry, 4/6/16, time 16:00, ADA Hughes, tel
21       number, looks like I just wrote 1, and then
22       results, made contact with CW-to call CW
23       back, to call AO.
24            Q.    And can you please explain what
25       that section in the result column means.
```

```
 1                        Hughes                    25
 2          A.    Based on reading it, I made a
 3    notation that I successfully contacted the
 4    complainant, but for whatever reason, I'd
 5    have to call back and I made a note to
 6    myself to all the arresting officers.
 7          Q.    And based on this sheet, is the
 8    arresting officer Shrell?
 9          A.    That is the arresting officer
10    name at the top of the sheet, but I don't
11    have an independent recollection of who the
12    arresting officer was?
13          Q.    Is there typically more than one
14    arresting officer for a case?
15          A.    To not get like hyper technical
16    on you.  Sometimes.
17          Q.    For an assault DAT, would it be
18    correct to say that there's only one
19    arresting officer?
20          A.    Not in every case, because -- so
21    sometimes like if you have an officer who's
22    high on overtime, the sergeant might
23    assign -- even though they made an arrest,
24    the sergeant might assign the case to
25    another officer for them to write up,
```

```
1                         Hughes                    26

2         almost along the lines of like overtime

3         measures or staffing measures.  So, it's

4         not necessarily that one person is the

5         arresting officer.

6              Q.    Would it be correct to say that

7         if the arresting officer has time, the

8         person that actually made the arrest would

9         be the arresting officer on the paperwork?

10             A.    That would be fair.

11             Q.    Now, can you go down to 4/14/16

12        and please read that entry.

13             A.    "Date 4/14/16, time 21:40, ADA

14        Hughes, Tel No. 1, completed interview with

15        CW.  CW to e-mail contact info of CW's

16        friends."

17             Q.    And here, the CW is Thomas

18        Jacobs?

19             A.    Yes.

20             Q.    And he was going to e-mail you

21        contact information for his friends?

22             A.    Yes.

23             Q.    And the implication being that

24        his friends were witnesses to the incident?

25             A.    Yes.
```

```
 1                    Hughes                    27

 2          Q.    Do you know if you ever received

 3    that e-mail?

 4          A.    I don't recall.

 5          Q.    If you did receive that e-mail,

 6    would it simply go to your work inbox?

 7                MR. CARROLL:  Objection to the

 8          form.

 9                MR. RICKNER:  Withdrawn.

10          Q.    ADA Hughes, do you have an e-mail

11    address that you use for your work as an

12    ADA?

13          A.    I do.

14          Q.    If Thomas Jacobs was going to

15    e-mail you contact information, would it go

16    to that e-mail address?

17          A.    Yes.

18          Q.    Do you preserve those e-mails,

19    meaning saved them for a period of time?

20                MR. CARROLL:  Objection to the

21          form.

22          Q.    You can answer.

23          A.    When I was in ECAB, I don't think

24    I saved e-mails.  It might just sit in my

25    inbox for a time until the Outlook
```

1                    Hughes                    28

2        automatically does something with it.

3            Q.    Now, I'd like to pull up --

4            MR. RICKNER:  I would like to

5        mark this as Exhibit 30, and this is

6        the witness contact information sheet,

7        Bates Stamp D_00126.

8                (Whereupon, the aforementioned

9        witness contact information sheet, Bate

10       Stamp D_00126 was marked as Exhibit 30

11       for identification as of this date by

12       the Reporter.)

13           Q.    Can you please pull that up.  It

14   bears Bates Stamp D_00126 --

15           MR. CARROLL:  Can we go off the

16       record for one second.

17           MR. RICKNER:  Sure.

18                (Whereupon, an off-the-record

19       discussion was held.

20           MR. CARROLL:  Back on the record.

21       I was just pointing out that the

22       question was whether ADA Hughes saved

23       his own e-mails, and that's up to each

24       ADA whether they save -- how they save

25       their own e-mails.  I just wanted it

1                     Hughes                    29

2           clear that the IT department does have

3           a mechanism -- I don't know how far

4           back it goes, but I know that they are

5           able to retrieve e-mails, you know,

6           that I ask for.

7                I have asked them to retrieve

8           e-mails at times, and they haven't been

9           able to find and retrieve them.  So

10          although how ADA Hughes saves them is

11          his, you know -- some people save them,

12          some people don't, there is a mechanism

13          by which they are saved for a certain

14          amount of time just by our information

15          technology department.

16               MR. RICKNER:  Understood.  Thank

17          you for the clarification.

18               (Whereupon, an off-the-record

19          discussion was held.)

20          Q.   So going back to Exhibit 30, can

21     you identify this for the record, please.

22          A.   At the top, it says, "Complaint

23     room witness contact information sheet."

24     There's a caption, "The People of the State

25     of New York against Cooper, Steven."  Then

1                           Hughes                    30

2    there's an arrest number, K16621359.

3           Q.    Now, is this a document that you

4    would prepare?

5           A.    It's generated as part of the

6    ECAB screening program.

7                 As I input contact information

8    for witnesses into the program, if you

9    click -- I don't remember what it's

10   labelled as, but this is the sheet that

11   gets printed.

12          Q.    Right.

13                So, if you can just look at

14   Exhibit 27, would I be correct in saying

15   that you entered information into a

16   database, and then the complaint room

17   screening sheet is a form that's then

18   printed out based on the information that

19   you've entered?

20          A.    I'm sorry.  Can you say that to

21   me one more time?

22          Q.    You identified there's a computer

23   program that you use as part of the ECAB

24   process?

25          A.    Yes.

                         Hughes                    31

1

2          Q.    And what's the name of that

3     computer program?

4          A.    Actually, I think it's just

5     called screening.

6          Q.    When you enter information into

7     the screening program, does it then print

8     out the complaint room screening sheet?

9          A.    Yes.

10         Q.    So, you don't go through and fill

11    out a form that looks like Exhibit 27,

12    right?

13         A.    Yes.

14         Q.    Instead, you entered different

15    information --

16              MR. RICKNER:  Withdrawn.

17         Q.    Instead, you enter information

18    into the system, and then the form is

19    generated?

20         A.    Yes.

21         Q.    Okay.

22              Now, looking at Exhibit 27 and

23    Exhibit 30 together, is there any

24    additional information that's contained in

25    the ECAB screening program that is not

```
 1                         Hughes                    32

 2         reflected on these two documents taken

 3         together?

 4                    MR. CARROLL:  Objection to the

 5              form.

 6              Q.    You can answer.

 7              A.    I mean, through the screening

 8         program, we draft the complaint, but I

 9         couldn't tell you if the way -- the way the

10         complaint, like it pops up in a separate

11         dialogue box, so I don't know if it's

12         actually part of the same program.

13              Q.    Okay.

14                    Let's take it this way.  Let's

15         say you recorded information regarding an

16         interview in the ECAB screening program,

17         would that information be provided verbatim

18         on a screening sheet like Exhibit 27?

19                    MR. CARROLL:  Objection to the

20              form.

21                    THE WITNESS:  It depends.

22              Q.    In certain instances, would you

23         write down statements by a witness inside

24         of the ECAB screening form, but it would be

25         printed out somewhere else?
```

1                          Hughes                    33

2          A.    What do you mean "printed out

3     somewhere else"?

4          Q.    Let's be more specific.  So is it

5     fair to say that on Exhibit 27, underneath

6     the double line that says "complaint

7     charges," there's a summary of the

8     allegations?

9          A.    Yes.

10         Q.    And this summary is based on the

11    documents you received in the DAT package,

12    along with your interviews?

13         A.    Yes.

14         Q.    Inside of the ECAB screening

15    program, would there be additional

16    information about underlying facts of the

17    case that is not included on Exhibit 27?

18         A.    Like I said, the complaint

19    generates separately.

20         Q.    Okay.

21         A.    But it might be part of the same

22    program, it might not, but everything else

23    usually pops up on the ECAB sheet.

24         Q.    I think you see where I'm going

25    with that.  What I'm wondering is, that is,

1                          Hughes                    34

2      is there a separate set of interview notes

3      that you would have had with Thomas Jacobs

4      that isn't reflected on Exhibit 27?

5          A.    No.

6          Q.    Now, going back to Exhibit 30,

7      can you tell based on Exhibit 30 itself

8      whether or not you spoke to each of these

9      witnesses?

10         A.    No.

11               MR. CARROLL:  Objection to the

12         form.

13         Q.    Okay.

14               Now, if you go down and there's

15     an assigned detective, do you see that?

16         A.    I do.

17         Q.    It says Ryan Lane?

18         A.    I see that.

19         Q.    Can you tell me his role in this

20     case?

21         A.    I don't recall his role in the

22     case.

23         Q.    Do you know Ryan Lane just

24     generally from your work as a district

25     attorney?

1                    Hughes                    35

2          A.    No.

3          Q.    Do you have any idea why Ryan

4    Lane was assigned as a detective to this

5    case?

6               MR. CARROLL:  Objection to the

7          form.

8               THE WITNESS:  I don't.

9          Q.    Would it be correct to say that

10   there are no narcotics allegations

11   reflected in the complaint?

12              And if you'd like to look at the

13   complaint, I think I provided it to you,

14   and it was previously marked as Exhibit 23?

15         A.    There's no narcotics allegations.

16         Q.    Do you know why somebody from

17   narcotics from Brooklyn South would have

18   been assigned to the case, then?

19              MR. CARROLL:  Objection to the

20         form.

21              MR. RICKNER:  I wouldn't know.

22         Q.    Okay.

23              Did you ever speak to him?

24              MR. CARROLL:  Objection to the

25         form.

Hughes                          36

1

2          Q.     Did you ever speak to Detective

3     Ryan Lane regarding the charges against

4     Steven Cooper?

5          A.     I don't recall.

6          Q.     Now, underneath, there's a

7     section that says "other officials"?

8          A.     I see that.

9          Q.     Can you read, I guess, the two

10    letters or two sets of letters after the

11    colon, Lieutenant MG, maybe?

12         A.     It could -- it could be

13    Lieutenant MG -- I mean, presuming there's

14    a phone number after it, that would make

15    sense.  I first thought it looked like CT,

16    but then I didn't know what the letters

17    would mean.

18         Q.     Sitting here today, do you know

19    what this other official was doing with

20    respect to this case?

21         A.     I don't recall.

22         Q.     Now, going back to the complaint

23    room screening sheet.

24         A.     Okay.

25         Q.     There's a section that says

1                    Hughes                    37

2        "reporters."  Do you see that?

3             A.    Yes.

4             Q.    What is a reporter in this

5        context?

6             A.    A reporter could be the person

7        who called 9-1-1 or somehow reported the

8        crime, whether it's to the police or maybe

9        it's the DA's action hotline or however the

10       crime got, you know, reported.

11            Q.    Is it fair to say that there's

12       typically a name associated with the

13       reporter?

14            A.    Yeah.

15            Q.    Do you know why there isn't a

16       name included here?

17            A.    Honestly, no.  Sometimes the ECAB

18       program can be a little wonky, and it --

19       down the line, the assigned can always

20       request a 9-1-1 call and figure out who it

21       is.  So it's not like a big deal.

22            Q.    Now, going down further, there's

23       a list of three witnesses.

24            A.    Yes.

25            Q.    And do you know if you spoke to

```
 1                        Hughes                38

 2        each of these witnesses?

 3                  MR. RICKNER:  Withdrawn.

 4        Q.    Let's break them out.

 5              Did you speak to Vasilis Xydias?

 6        V-A-S-I-L-I-S.  X-Y-D-I-A-S.

 7        A.    If you look further down on the

 8        screen sheet, it says "interviewed

 9        telephone," indicating that I would have

10        spoken to this witness, but I don't have a

11        recollection of the conversation.

12        Q.    And going down further, there's a

13        witness Steve Mona.  Do you see that?

14        A.    Yes.

15        Q.    And is it correct to say that you

16        did not speak to Mr. Mona?

17        A.    Based on this sheet, yeah, it

18        says "no interview," and then my reason

19        said "unavailable."

20        Q.    And then going one further down,

21        there's Thomas Jacobs?

22        A.    Yes.

23        Q.    And you did have an interview

24        with him; is that correct?

25        A.    Yes, it says "interview
```

```
 1                          Hughes                    39

 2      telephone."

 3              Q.    Do you know when that interview

 4      took place based on the documentation I put

 5      in front of you?

 6                    MR. CARROLL:  Objection to form.

 7                    MR. RICKNER:  Withdrawn.

 8              Q.    Do you know when you interviewed

 9      Thomas Jacobs with respect to the charges

10      against Steven Cooper?

11              A.    Based on the complaint room

12      tracking sheet, I spoke to the complainant,

13      Mr. Jacobs, on April 6th and April 14th of

14      2016.

15              Q.    If you had spoken to him

16      additional times, would that be reflected

17      somewhere in these documents?

18              A.    I would have probably written it

19      down under the attempts to contact CW on

20      the tracking sheet.

21              Q.    Now, there's a section here and

22      it says, "DAT:  Def punched CW and broke

23      CW's glasses"?

24              A.    Yes.

25              Q.    Does this reflect the statements
```

```
1                        Hughes              40

2       that were made during the interview?

3               A.      That specific line?

4               Q.      No, no, no.  The information that

5       comes afterwards, but before the line where

6       it says "reporters."

7               A.      That section is a summary of the

8       interviews, paperwork.  It's a way for me

9       to write out what I found to be the facts

10      of the case.

11              Q.      Based on what's written here, can

12      you tell which witness gave you which piece

13      of information?

14              A.      No.

15              Q.      Is the complaint room screening

16      sheet kept in the ordinary course of the

17      Kings County District Attorney's Office's

18      business?

19              A.      Yes.

20              Q.      And did you make this complaint

21      room screening sheet in the routine course

22      of the Kings County District Attorney's

23      business?

24              A.      Yes.

25              Q.      And did you make this record at
```

```
 1                        Hughes                    41

 2        or near the time of the transactions that

 3        are detailed within it?

 4             A.    Not too far after, I suppose.

 5             Q.    Within a couple of days?

 6             A.    Well, you're -- the incident here

 7        was March 20th, and by April 20th would be

 8        the last date listed on the screening

 9        program.  So within a month.

10             Q.    How differently -- did you record

11        the information contained in the complaint

12        room screening sheet near the time that you

13        received the information from Thomas Jacobs

14        and the other witness?

15             A.    Yes.

16             Q.    And did you create --

17             MR. RICKNER:  Withdrawn.

18             Q.    Now, I'd like to go back a little

19        bit -- go back to this paragraph, and I

20        think it's the second sentence from the

21        bottom.  It says "injuries" and there's a

22        colon.

23             A.    Okay.

24             Q.    And it goes, "CW suffered redness

25        and bruising (photos)."
```

```
1                          Hughes                    42

2                Do you see that?

3         A.     I do.

4         Q.     Would you have had copies of the

5    photos when you screened Mr. Cooper's DAT?

6         A.     Probably not.

7         Q.     That would indicate that somebody

8    told you that there were photos available?

9         A.     That's likely.

10        Q.     All right.

11               Going down to --

12               MR. RICKNER:  Withdrawn.

13        Q.     Going to Exhibit 23, can you

14   identify the first page of Exhibit 23 for

15   the record?

16        A.     I'm sorry.  Which exhibit is 23?

17        Q.     Oh, sorry.  It's the complaint.

18   The complaint, because on the back, I have

19   the supporting deposition from Jacobs.  I

20   understand those are two different

21   documents, I'll just refer to them as first

22   page, second page.

23        A.     Sure.

24               So, the first page says,

25   "Criminal Court of the City of New York
```

```
 1                    Hughes                    43

 2        part APAR County of Kings," there's a

 3        caption, "The People of the State of New

 4        York versus Steven Cooper."  On the

 5        right-hand side, it says, "State of New

 6        York County of Kings."  The second page at

 7        the top --

 8             Q.    Just the first page.  I'm sorry

 9        to cut you off.  Is it fair to say that the

10        first page of Exhibit 23 is a charging

11        instrument?

12             A.    Yes.

13             Q.    And this is the document by which

14        the criminal case against Mr. Cooper

15        starts?

16             A.    Yes.

17             Q.    Now, did you sign the first page

18        of Exhibit 23?

19             A.    Yes.

20             Q.    But is it correct to say that you

21        did not have first-hand knowledge of the

22        underlying facts of the crime?

23             A.    That's correct.

24             Q.    You had to receive the

25        information from your witness interviews,
```

```
 1                    Hughes                    44
 2      right?
 3           A.    Yes.
 4           Q.    And based on the information you
 5      received, you determined which charges
 6      could be brought?
 7           A.    Yes.
 8           Q.    And you also included what the
 9      witnesses had said in this complaint
10      itself, right?
11           A.    Yes.
12           Q.    So I'd like to go to the --
13      really, the third sentence from the bottom,
14      but it's also the third paragraph from the
15      bottom, and it says, "Deponent is informed
16      by Thomas Jacobs' death."
17           A.    I'm looking at it.
18           Q.    And it says that at the above
19      time and place, "Defendant struck informant
20      about the face with a closed fist."  Do you
21      see that?
22           A.    I do.
23           Q.    Is the informant in this sentence
24      Thomas Jacobs?
25           A.    Yes.
```

```
 1                    Hughes              45
 2         Q.    And that means that Thomas Jacobs
 3    told you that Defendant, Steven Cooper,
 4    struck him in the face with a closed fist,
 5    right?
 6         A.    Yes, based on the complaint.
 7         Q.    And moving to the second
 8    paragraph, it says that --
 9              MR. RICKNER:  Withdrawn.
10         Q.    In the second paragraph from the
11    bottom, the informant, Thomas Jacobs, said
12    that being struck by Mr. Cooper with a
13    closed fist caused him to suffer redness
14    and bruising about the face, a concussion,
15    to suffer substantial pain, to fear further
16    physical injury and to become alarmed and
17    annoyed?
18         A.    Yes.
19         Q.    And that was information that
20    Thomas Jacobs told you, right?
21         A.    Based on the complaint, yes.
22         Q.    Now, I'd like to go to the second
23    page of Exhibit 23.
24         A.    Okay.
25         Q.    And this is a supporting
```

```
1                        Hughes                    46

2       deposition; is that right?

3              A.     Yes.

4              Q.     What is a supporting deposition?

5              A.     Supporting deposition is a

6       document that we use in practice to convert

7       a criminal court complaint into an

8       information.

9              Q.     And is it necessary to convert a

10      criminal court complaint into an

11      information because the charging instrument

12      must be effectively signed or sworn to by

13      somebody with personal knowledge?

14             A.     Yes.

15             Q.     And did Thomas Jacobs sign this

16      supporting deposition under oath?

17             A.     I don't know.

18             Q.     Do you have any reason to believe

19      he didn't?

20             A.     I didn't draft this document.

21             Q.     Okay.

22                    Somebody at some point in the

23      future would have drafted this document and

24      effectively attached it to the complaint

25      that you had drafted and signed?
```

1                          Hughes                    47

2          A.    Yes.

3          Q.    Now, going back to the first page

4     of Exhibit 23, would it be correct to say

5     that the offenses are listed roughly in

6     order of severity?

7               MR. CARROLL:  Objection to the

8          form.

9               THE WITNESS:  I mean, I don't

10          know how it does -- as to how the

11          program sorts it out when they're in

12          the same level, but it usually starts

13          with the higher ones, and then goes to

14          the lower ones.

15          Q.    Are you familiar with the phrase

16     "top charge"?

17          A.    Yes.

18          Q.    What is the top charge?

19          A.    Here, the top charges would be

20     assault in the third degree and criminal

21     mischief in the fourth degree.

22          Q.    And what makes those the top

23     charges?

24          A.    They are both A misdemeanors.

25          Q.    And would it be correct to say

```
1                          Hughes                    48

2       that the remaining charges are B

3       misdemeanors?

4                  MR. CARROLL:  Objection to the

5            form.

6                  THE WITNESS:  No.

7            Q.    Is attempted assault in the third

8       degree an A misdemeanor or a B misdemeanor?

9            A.    It's a B misdemeanor.

10           Q.    What about menacing in the third

11      degree?

12           A.    That is a B misdemeanor.

13           Q.    What about harassment in the

14      second degree?

15           A.    That's a violation.

16           Q.    Would it be correct to say that a

17      violation contains no jail time --

18           A.    No, no.

19           Q.    You can go to jail for a

20      violation?

21           A.    You can.

22           Q.    What is the maximum sentence for

23      a violation?

24           A.    I think it's 30 days.

25                 MR. CARROLL:  Objection.  I mean,
```

```
 1                    Hughes              49

 2         are we asking --

 3              MR. RICKNER:  I've got two more

 4         questions on this --

 5              MR. CARROLL:  I'm just asking --

 6         I mean, this is something we can find

 7         out from a law book, we don't need to

 8         be asking --

 9              MR. RICKNER:  I come up with

10         three, but I still need somebody to say

11         it at trial, and my client can't do it.

12              MR. CARROLL:  And can we just go

13         off the record.

14              (Whereupon, an off-the-record

15         discussion was held.)

16         Q.    ADA Hughes, is it correct to say

17     that the maximum sentence for a violation

18     is 15 days in prison?

19         A.    Yes.

20         Q.    Is it correct to say that the

21     maximum sentence for a B misdemeanor is

22     three months in prison?

23         A.    Yes.

24         Q.    Is it correct to say that the

25     maximum sentence for an A misdemeanor is
```

1                          Hughes                          50

2       one year in prison?

3                A.    Yes.

4                Q.    In order to be accused of the

5       charge assault in the third degree, is it

6       necessary for there to be an actual injury?

7                A.    Well, I mean, we start --

8                     MR. CARROLL:  Objection to the

9                form.

10                    THE WITNESS:  I think you got to

11               start getting into the case law.  You

12               definitely have it as hurt, but I think

13               the case law is you have to suffer

14               substantial pain, so --

15               Q.    So, let me rephrase it.

16                    Is it correct to say that in

17      order to be charged with assault in the

18      third degree, you have to cause substantial

19      pain?

20               A.    Yes.

21               Q.    So if somebody did not cause

22      substantial pain, they couldn't be charged

23      for that crime?

24               A.    Correct.

25                    MR. CARROLL:  Off the record.

```
 1                        Hughes              51
 2                (Whereupon, an off-the-record
 3           discussion was held.)
 4                MR. RICKNER:  So moving on.  On
 5           the record, please.
 6           Q.    Are you familiar --
 7                MR. RICKNER:  Withdrawn.
 8           Q.    ADA Hughes, are you familiar with
 9      the phrase "decline to prosecute"?
10           A.    Yes.
11           Q.    What does that mean?
12           A.    "Decline to prosecute" means that
13      we're not proceeding further on a case,
14      usually at the ECAB stage.
15           Q.    Is it fair to say that if at the
16      ECAB stage there's a determination not to
17      prosecute someone, then ultimately they
18      won't have to go to court for those
19      charges, and charges won't be brought
20      against them, for that specific set of
21      allegations?
22                MR. CARROLL:  Objection to the
23           form.
24                THE WITNESS:  Can you just break
25           your question up a little bit for me.
```

1                          Hughes                    52

2              I'm sorry.

3                  MR. RICKNER:  That's fine.

4          Q.    Would it be correct to say that

5      there are certain instances where after

6      listening to the complaining witness, the

7      district attorney decides not to bring

8      charges?

9          A.    Yes.

10         Q.    And that means that a criminal

11     complaint is never drafted, right?

12         A.    It would be more correct to say

13     it's not filed.

14         Q.    So it would be correct to say

15     that if a determination is made to decline

16     to prosecute, a criminal complaint is not

17     filed, right?

18         A.    Yes.

19         Q.    And, therefore, the criminal

20     prosecution is not set in motion, right?

21         A.    Right.

22         Q.    At the ECAB stage, who makes the

23     determination to decline to prosecute?

24         A.    Ultimately, it would be a

25     decision signed off on by a boss.  If you

```
 1                        Hughes                53
 2     as the screener have an inkling that it
 3     might be a DP, you can tell the boss and
 4     discuss it.
 5          Q.    Would it be correct to say, then,
 6     that the boss has the final -- makes the
 7     final determination.
 8          A.    The boss always makes the final
 9     say.
10          Q.    What factors go into determining
11     that a case should be declined to
12     prosecute?
13               MR. CARROLL:  Objection to the
14          form.
15               THE WITNESS:  It depends.
16          Sometimes there's no crime.  Sometimes
17          it's an interest of justice sort of
18          thing, sometimes there's an obviously
19          bad search.
20               I mean, our office, for a while,
21          was -- I mean, we were in the paper on
22          marijuana cases, we were dismissing
23          those in the interest of justice.
24          There's -- I mean, it's -- there could
25          be like a whole host of reasons why to
```

1                          Hughes                    54

2          DP a case.

3               Q.    If a complaining witness is

4          proven to have credibility problems,

5          they're not telling the complete truth,

6          would that be a reason to decline to

7          prosecute?

8               A.    I -- it could be.

9               Q.    If the defendant was a victim of

10         a crime at the hands of the complaining

11         witness, would that be a reason to decline

12         to prosecute?

13              A.    I don't understand your question.

14              Q.    Let's say there's a case where --

15              MR. RICKNER:  Withdrawn.

16              Q.    Let's make it specific.

17                    Here, the allegation is in the

18         complaint that Mr. Cooper struck

19         Mr. Jacobs; is that correct?

20              A.    Yes.

21              Q.    If it came to light that

22         Mr. Jacobs had instigated the fight, and

23         then badly injured Mr. Cooper, would that

24         have gone into a decision as to whether or

25         not to decline to prosecute?

```
1                          Hughes                    55

2              MR. CARROLL:  Objection to the

3         form.

4              THE WITNESS:  That depends, I

5         think.

6         Q.    Depends on what?

7         A.    For one, it would depend on if I

8    knew about that, but, two, my understanding

9    is I -- I think this was -- it wasn't a

10   cross-complaint, but there was another case

11   based on the screening sheet that went

12   along with this.  So there were charges on

13   somebody else.

14              Based on the screening sheet,

15   someone named Daniel O'Connor was arrested

16   for assaulting Mr. Cooper and the

17   associated arrest number.  But I don't

18   recall if I ever wrote up that case.  If it

19   was a DAT, it might have just been in the

20   bin.

21        Q.    Right.  And let me take a step

22   back.

23              Obviously, you can't make a

24   determination as to whether or not to

25   decline to prosecute based on information
```

1                    Hughes                    56

2        you don't get, right?

3              A.    Correct.

4              Q.    What I'm asking is, if you had

5        received information that Thomas Jacobs had

6        initiated the fight against Mr. Cooper, and

7        then proceeded to beat him up, would that

8        go into your determination as to whether or

9        not to decline to prosecute had you known

10       that information?

11             MR. CARROLL:  Objection to the

12         form.

13             Q.    You can answer.

14             A.    I mean, if I knew it at the time?

15             Q.    Yes.

16             A.    If I knew that at the time, I

17       mean, we're kind of talking hypotheticals

18       right now, but if someone had communicated

19       that to me, I would have put it into the

20       narrative or the screening sheet and

21       discussed it with the boss, because that

22       can go into bail factors and, you know,

23       other stuff evaluating the case.

24              I don't know if I would

25       necessarily -- because you might need more

```
1                        Hughes                    57

2        investigation by the assigned, and the role

3        of an ADA in ECAB is to screen the case.

4        If there's something glaring, maybe we DP

5        it.  But otherwise, we need to get it

6        assigned to an ADA to dive in and

7        investigate.

8             Q.    If someone --

9                   MR. RICKNER:  Withdrawn.

10            Q.    If during the interviews as part

11       of the DAT screening it is determined that

12       the defendant was also the victim of a

13       crime, would that be investigated by the

14       District Attorney's Office?

15            A.    Yeah, and I mean, based on my

16       screening sheet, there was a case, I don't

17       know how that happened to that case.

18            Q.    Understood.

19                  But it's correct to say that

20       based on your screening sheet, it says

21       Daniel O'Connor was the assailant, right?

22            A.    Yes.

23            Q.    If you had known that police

24       Lieutenant Thomas -- Ms. Jacobs was also an

25       assailant, would that have been
```

```
 1                    Hughes                    58
 2     investigated by the district attorney?
 3                MR. CARROLL:  Objection to the
 4           form.
 5                THE WITNESS:  Yeah.
 6           Q.    And by putting that information
 7     in the screening sheet, that flags the
 8     issue for the future district attorney who
 9     ultimately handles the case, right?
10           A.    I mean, that's part of the reason
11     they put it in the screening sheet.
12                MR. RICKNER:  And let's go off
13           the record for two minutes.  I want to
14           talk to Yitzchok for a second, and then
15           maybe if I'm lucky, we can just wrap
16           this up.
17                (Whereupon, an off-the-record
18           discussion was held.)
19           Q.    ADA Hughes, is there anything in
20     the complaint room screening sheet that
21     indicates that Mr. Cooper was the one who
22     made the 9-1-1 call?
23           A.    No.
24           Q.    If you had received that
25     information during your interviews, would
```

1                            Hughes                 59

2          you have included it in the complaint room

3          screening sheet?

4                  A.    Yes, that's likely.

5                  MR. CARROLL:  Off the record.

6                  (Whereupon, an off-the-record

7          discussion was held.)

8                  Q.    ADA Hughes, is there anything in

9          Exhibit 27 that indicates that Mr. Cooper

10         called 9-1-1?

11                 A.    There is.  I misspoke before.  I

12         was thinking Thomas Jacobs in my head, but

13         there's a notation that Steve Cooper called

14         9-1-1 and stated he was robbed at gunpoint.

15                 Q.    Where did you receive that

16         information from?

17                 A.    I don't know.

18                 Q.    After the DAT is screened, the

19         information is provided to a different

20         district attorney who actually handles the

21         case; is that correct?

22                 A.    Yes.  I would just note that our

23         practice has changed a little bit since I

24         was in ECAB, our office has gone largely

25         vertical.  I don't know if it's the same

1                         Hughes                    60

2       for DATs now as it was in 2016?

3              Q.     Okay.

4                     Well, although I'm actually

5       interested to know that as a general

6       matter, specifically in April of 2016,

7       after the DAT screening process was

8       finished, a different district attorney

9       would ultimately take over to process the

10      case, right?

11             A.     Yes.

12             Q.     And that district attorney would

13      often rely on the information that was

14      obtained during the ECAB process, right?

15             A.     That's fair to say.  It depends

16      on the assigned ADA.

17             Q.     There are instances when the

18      assigned ADA does not go back and

19      re-interview the complaining witness,

20      right?

21                    MR. CARROLL:  Objection to the

22             form.

23                    THE WITNESS:  I mean, I guess.  I

24             don't -- I don't think I have ever done

25             that in my practice.

```
1                        Hughes                    61
2           Q.     Would you -- in your practice, do
3      you re-interview the complaining witness
4      prior to the first court appearance
5      following arraignment?
6           A.     That depends.
7                  MR. CARROLL:  Objection to the
8           form.
9                  THE WITNESS:  The goal is to
10          reach a witness as soon as you can.  It
11          doesn't always necessarily happen
12          before the first court date.
13          Especially in a case like a DAT where
14          nobody is in custody.
15                 It's certainly different for a
16          felony matter, where someone is
17          incarcerated.
18          Q.     And there can be instances where
19     the complaining witness is not
20     re-interviewed by the district attorney
21     who's handling the prosecution, until
22     several court appearances have been made,
23     right?
24          A.     I would sometimes, maybe it -- it
25     really depends on your ADA, but it would
```

1                           Hughes                    62

2        also depend on the responsiveness of your

3        witness.

4              Q.    If a police officer has a history

5        of misconduct, would that be part of the

6        consideration as to whether or not to

7        decline to prosecute?

8                    MR. CARROLL:  Objection to the

9              form.

10                   THE WITNESS:  Back in 2016, if

11             you knew about it, it might be a factor

12             in moving forward on the case.  It

13             would depend on what the allegations of

14             misconduct were, whether they were

15             substantiated, et cetera.

16                   Since then, we've -- under the

17             new discovery law, things have changed

18             a little bit about how we have access

19             to that information and process our

20             cases.

21             Q.    Is it fair to say you have more

22        access to information than we did before

23        the change in 50A?

24             A.    I believe so, yeah.

25             Q.    But going back, if the

1                              Hughes                    63

2          complaining witness had credibility issues,

3          would that go into the decision as to

4          whether or not to decline to prosecute?

5                    MR. CARROLL:  Objection to the

6               form.

7                    THE WITNESS:  It could go into

8               that if you know that there's a

9               credibility issue.

10         Q.      So if you did know that was a

11         credibility issue, would that go into the

12         determination as to whether or not to

13         decline to prosecute?

14                   MR. CARROLL:  Objection to the

15              form.

16         A.      If I know that a witness has a

17         credibility issue, then we -- I would have

18         to conference it with the supervisor and we

19         would discuss how to move the case forward

20         or not.

21         Q.      And because of the credibility

22         issue, there is a chance that you decide

23         not to move the case forward and prosecute,

24         right?

25         A.      It depends on the credibility

```
1                        Hughes              64
2    issue we're talking about.
3         Q.    But some credibility issues will
4    rise to the point where you say I'm not
5    going to prosecute this case because the
6    witness is incredible?
7         A.    That can happen, yeah.
8              MR. RICKNER:  All right.  Thank
9         you very much for your time.  I did
10        think I did make my hour and a half
11        promise deadline, unless somebody else
12        has some questions they want to jump in
13        on.
14             THE WITNESS:  Thank you very
15        much.
16             MR. DELUCA:  I have no questions.
17             MR. MOSCHELLA:  No questions.
18             MR. RICKNER:  Fantastic, guys.
19             Do you want to hold on the line
20        for just a second, and let the --
21             Off the record.
22             (Whereupon, an off-the-record
23        discussion was held.)
24             MR. CARROLL:  I want it on the
25        record, but I'm addressing you, that
```

```
1                       Hughes                    65

2         you are going to send us a copy

3         pursuant to the Federal --

4              MR. RICKNER:  You're preserving

5         your right to review and sign.  Got it.

6         I will do so.

7              MR. CARROLL:  Yes, I am.  Okay.

8         Thank you.

9                 Have a good day, everyone.

10             MR. RICKNER:  Thank you.

11                (Time note:  4:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          Hughes                        66

2       November 4, 2020

3                        ERRATA

4

5       PAGE/LINE        CHANGE/REASON

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

1                          Hughes                          67

2

3

4

5

6

7

8                                    _____

9                                    SEAN HUGHES

10

11

12

13     Subscribed and sworn to

14     before me this     day

15     of              2020

16

17     _____

18

19

20

21

22

23

24

25

```
 1                                                     68

 2                      CERTIFICATE

 3      STATE OF NEW YORK )

 4                        ) ss.

 5      COUNTY OF KINGS   )

 6

 7           I, Rose Marie Iacobellis, a Shorthand

 8      Reporter and Notary Public within and for

 9      the State of New York, do hereby certify:

10           That SEAN HUGHES, the witness whose

11      deposition is hereinbefore set forth, was

12      duly sworn by me and that such deposition is

13      a true record of the testimony given by such

14      witness.

15           I further certify that I am not

16      related to any of the parties to this action

17      by blood or marriage and that I am in no way

18      interested in the outcome of this matter.

19

20

21           _____

22           ROSE MARIE IACOBELLIS

23

24

25
```

```
1                                                      69

2        November 4, 2020

3
                              INDEX
4

5        WITNESS                EXAMINATION BY      PAGE

6        Sean Hughes          Mr. Rickner          5

7
         EXHIBIT        PAGE
8
         Exhibit 27     8       Complaint room
9                                screening sheet Bates
                                 number, D_00119 to 120
10
         Exhibit 28     16      Document Bates Stamped
11                               D_00116

12       Exhibit 29     23      Complaint room tracking
                                 sheet
13
         Exhibit 30     28      Witness contact
14                               information sheet
                                 Bate Stamp D_00126
15

16

17

18

19

20

21

22

23

24

25
```

## 1

**1** [2] - 24:21, 26:14
**100** [1] - 2:15
**10007** [2] - 2:16, 2:23
**10279** [1] - 3:8
**11201** [1] - 3:14
**120** [3] - 8:3, 8:13, 69:9
**14th** [1] - 39:13
**15** [1] - 49:18
**16** [1] - 69:10
**16:00** [1] - 24:20
**17-cv-01517** [1] - 1:6

## 2

**2015** [1] - 7:19
**2016** [7] - 9:13, 13:15, 22:21, 39:14, 60:2, 60:6, 62:10
**2019** [1] - 1:9
**2020** [3] - 66:2, 67:15, 69:2
**20th** [5] - 13:14, 22:21, 41:7
**21:40** [1] - 26:13
**2220** [1] - 2:6
**225** [1] - 2:22
**23** [9] - 35:14, 42:13, 42:14, 42:16, 43:10, 43:18, 45:23, 47:4, 69:12
**233** [2] - 2:6, 3:7
**2340** [1] - 3:7
**27** [15] - 8:9, 8:14, 8:17, 11:17, 15:22, 20:13, 30:14, 31:11, 31:22, 32:18, 33:5, 33:17, 34:4, 59:9, 69:8
**28** [6] - 16:7, 16:10, 16:12, 16:19, 69:10, 69:13
**29** [5] - 23:10, 23:13, 23:16, 23:24, 69:12

## 3

**30** [8] - 28:5, 28:10, 29:20, 31:23, 34:6, 34:7, 48:24, 69:13
**350** [2] - 3:13, 5:13
**3:07** [1] - 1:10

## 4

**4** [3] - 1:9, 66:2, 69:2
**4/14/16** [2] - 26:11, 26:13
**4/16** [1] - 24:19
**4/6/16** [1] - 24:20
**4:30** [1] - 65:11

## 5

**5** [1] - 69:6
**50A** [1] - 62:23

## 6

**6th** [1] - 39:13

## 7

**715** [1] - 2:22

## 8

**8** [1] - 69:8

## 9

**9-1-1** [5] - 37:7, 37:20, 58:22, 59:10, 59:14

## A

**A-I-T-K-E-N** [1] - 10:9
**AARON** [1] - 2:19
**able** [2] - 29:5, 29:9
**absolutely** [2] - 6:11, 12:11
**access** [2] - 62:18, 62:22
**accusatory** [2] - 9:3, 20:12
**accused** [1] - 50:4
**action** [4] - 5:17, 23:25, 37:9, 68:16
**actual** [1] - 50:6
**ADA** [25] - 3:12, 3:15, 5:15, 10:3, 10:16, 18:20, 20:23, 21:9, 21:15, 24:20, 26:13, 27:10, 27:12, 28:22, 28:24, 29:10, 49:16, 51:8, 57:3, 57:6, 58:19, 59:8, 60:16, 60:18, 61:25
**ADA/Para** [1] - 23:21
**additional** [4] - 20:6, 31:24, 33:15, 39:16
**address** [4] - 5:12, 12:10, 27:11, 27:16
**addressing** [1] - 64:25
**administer** [1] - 4:12
**aforementioned** [4] - 8:11, 16:8, 23:11, 28:8
**afterwards** [1] - 40:5
**AGREED** [3] - 4:4, 4:9, 4:13
**Aitken** [1] - 10:9
**al** [1] - 1:7
**alarmed** [1] - 45:16
**ALL** [1] - 2:2
**allegation** [1] - 54:17
**allegations** [5] - 33:8, 35:10, 35:15, 51:21, 62:13
**alleges** [1] - 24:14
**allowed** [2] - 21:22, 22:19
**almost** [1] - 26:2
**amount** [1] - 29:14
**AND** [3] - 4:4, 4:9, 4:13
**annoyed** [1] - 45:17
**answer** [5] - 6:12, 21:3, 27:22, 32:6, 56:13
**answers** [1] - 7:11
**AO** [1] - 24:23
**APAR** [1] - 43:2
**appearance** [7] - 9:18, 10:12, 12:23, 13:2, 15:6, 15:11, 61:4
**APPEARANCES** [2] - 2:2, 3:2
**appearances** [1] - 61:22
**apply** [1] - 6:22
**approved** [1] - 22:9
**April** [7] - 9:13, 13:14, 22:21, 39:13, 41:7, 60:6
**arraigned** [1] - 12:2
**arraignment** [3] - 19:24, 20:3, 61:5
**arraignments** [1] - 9:11
**Arrest** [1] - 16:15
**arrest** [14] - 9:21, 14:10, 14:13, 14:16, 15:19, 15:21, 16:18, 16:25, 17:13, 19:15, 25:23, 26:8, 30:2, 55:17
**arrested** [3] - 18:21, 18:23, 55:15
**arresting** [13] - 14:21, 17:11, 17:21, 19:14, 25:6, 25:8, 25:9, 25:12, 25:14, 25:19, 26:5, 26:7, 26:9
**assailant** [2] - 57:21, 57:25
**assault** [16] - 10:3, 11:3, 11:17, 11:18, 11:19, 11:22, 12:21, 13:8, 17:8, 20:5, 23:3, 25:17, 47:20, 48:7, 50:5, 50:17
**assaulting** [1] - 55:16
**assessment** [2] - 8:24, 9:5
**assign** [3] - 10:15, 25:23, 25:24
**Assigned** [1] - 23:21
**assigned** [17] - 8:25, 10:3, 10:25, 11:19, 11:22, 11:23, 12:3, 13:8, 20:4, 34:15, 35:4, 35:18, 37:19, 57:2, 57:6, 60:16, 60:18
**assigns** [1] - 15:4
**associated** [2] - 37:12, 55:17
**attached** [1] - 46:24
**attempted** [1] - 48:7
**Attempts** [1] - 24:6
**attempts** [2] - 24:17, 39:19

**Attorney** [1] - 3:12
**attorney** [12] - 5:25, 6:4, 6:14, 15:13, 34:25, 52:7, 58:2, 58:8, 59:20, 60:8, 60:12, 61:20
**Attorney's** [6] - 7:15, 14:3, 14:8, 40:17, 40:22, 57:14
**ATTORNEY'S** [1] - 3:11
**Attorneys** [4] - 2:5, 2:13, 2:20, 3:5
**authorized** [1] - 4:11
**automatically** [1] - 28:2
**available** [1] - 42:8

## B

**bad** [1] - 53:19
**badly** [1] - 54:23
**bail** [1] - 56:22
**based** [18] - 17:12, 25:2, 25:7, 30:18, 33:10, 34:7, 38:17, 39:4, 39:11, 40:11, 44:4, 45:6, 45:21, 55:11, 55:14, 55:25, 57:15, 57:20
**Bate** [1] - 28:9, 69:14
**Bates** [8] - 8:2, 8:12, 16:4, 16:9, 28:7, 28:14, 69:9, 69:10
**bears** [3] - 8:2, 23:19, 28:14
**beat** [1] - 56:7
**become** [1] - 45:16
**becomes** [1] - 21:11
**between** [2] - 4:5, 6:13
**big** [1] - 37:21
**bin** [1] - 55:20
**bit** [4] - 41:19, 51:25, 59:23, 62:18
**blood** [1] - 68:17
**body** [1] - 19:16
**book** [3] - 17:19, 17:20, 49:7
**Booking** [1] - 13:6
**bookings** [1] - 19:9
**boss** [6] - 22:12, 52:25, 53:3, 53:6, 53:8, 56:21
**bottom** [4] - 41:21, 44:13, 44:15, 45:11
**box** [4] - 11:4, 11:8, 15:17, 32:11
**break** [3] - 6:13, 38:4, 51:24
**bring** [1] - 52:7
**Broadway** [3] - 2:6, 2:22, 3:7
**broke** [1] - 39:22
**Brooklyn** [3] - 3:14, 5:13, 35:17
**brought** [3] - 14:22, 44:6, 51:19
**bruising** [2] - 41:25, 45:14
**BSA** [1] - 17:22

**bureau** [2] - 8:24, 9:5
**business** [2] - 40:18, 40:23
**BY** [6] - 2:8, 2:17, 3:9, 3:15, 5:8, 69:5

**C**

**cannot** [1] - 7:10
**caption** [2] - 29:24, 43:3
**CARROLL** [41] - 3:15, 12:6, 12:14, 13:11, 13:16, 17:3, 18:12, 18:17, 19:3, 20:25, 27:7, 27:20, 28:15, 28:20, 32:4, 32:19, 34:11, 35:6, 35:19, 35:24, 39:6, 47:7, 48:4, 48:25, 49:5, 49:12, 50:8, 50:25, 51:22, 53:13, 55:2, 56:11, 58:3, 59:5, 60:21, 61:7, 62:8, 63:5, 63:14, 64:24, 65:7
**case** [46] - 8:20, 8:24, 9:4, 9:6, 9:14, 9:21, 10:2, 12:4, 14:21, 15:8, 17:9, 19:13, 19:23, 21:22, 22:13, 25:14, 25:20, 25:24, 33:17, 34:20, 34:22, 35:5, 35:18, 36:20, 40:10, 43:14, 50:11, 50:13, 51:13, 53:11, 54:2, 54:14, 55:10, 55:18, 56:23, 57:3, 57:16, 57:17, 58:9, 59:21, 60:10, 61:13, 62:12, 63:19, 63:23, 64:5
**Case** [1] - 1:5
**cases** [6] - 9:2, 9:24, 15:5, 16:21, 53:22, 62:20
**caused** [1] - 45:13
**Central** [1] - 13:6
**certain** [4] - 10:2, 29:13, 32:22, 52:5
**certainly** [1] - 61:15
**CERTIFICATE** [1] - 68:2
**certify** [2] - 68:9, 68:15
**cetera** [1] - 62:15
**chance** [2] - 6:14, 63:22
**change** [1] - 62:23
**CHANGE/REASON** [1] - 66:5
**changed** [2] - 59:23, 62:17
**charge** [5] - 9:17, 10:6, 47:16, 47:18, 50:5
**charged** [3] - 11:24, 50:17, 50:22
**charges** [11] - 33:7, 36:3, 39:9, 44:5, 47:19, 47:23, 48:2, 51:19, 52:8, 55:12
**charging** [2] - 43:10, 46:11
**chief** [1] - 9:16
**CHRISTOPHER** [1] - 2:17
**Church** [1] - 2:15
**CITY** [2] - 1:7, 2:12
**City** [3] - 2:14, 14:7, 42:25

**Civil** [1] - 1:17
**clarification** [1] - 29:17
**clear** [4] - 6:6, 6:12, 7:11, 29:2
**click** [1] - 30:9
**client** [1] - 49:11
**closed** [3] - 44:20, 45:4, 45:13
**colleagues** [1] - 11:23
**collect** [3] - 19:19, 20:4, 20:6
**collection** [1] - 10:11
**collects** [1] - 10:19
**colon** [2] - 36:11, 41:22
**column** [1] - 24:25
**committed** [1] - 24:14
**communicated** [1] - 56:18
**complainant** [2] - 25:4, 39:12
**complainant's** [1] - 17:14
**complaining** [10] - 24:9, 24:12, 24:13, 52:6, 54:3, 54:10, 60:19, 61:3, 61:19, 63:2
**Complaint** [3] - 29:22, 69:8, 69:12
**complaint** [41] - 7:24, 8:12, 8:18, 8:22, 8:23, 9:10, 11:15, 17:14, 21:12, 22:6, 22:12, 23:7, 23:12, 23:18, 30:16, 31:8, 32:8, 32:10, 33:6, 33:18, 35:11, 35:13, 36:22, 39:11, 40:15, 40:20, 41:11, 42:17, 42:18, 44:9, 45:6, 45:21, 46:7, 46:10, 46:24, 52:11, 52:16, 54:18, 55:10, 58:20, 59:2
**complete** [1] - 54:5
**completed** [1] - 26:14
**computer** [2] - 30:22, 31:3
**concussion** [1] - 45:14
**conference** [1] - 63:18
**consideration** [1] - 62:6
**considered** [1] - 15:7
**consulted** [1] - 21:19
**contact** [13] - 17:15, 24:6, 24:17, 24:22, 26:15, 26:21, 27:15, 28:6, 28:9, 29:23, 30:7, 39:19, 69:13
**contacted** [1] - 25:3
**contained** [2] - 31:24, 41:11
**contains** [1] - 48:17
**context** [1] - 37:5
**CONTINUED** [1] - 3:2
**conversation** [1] - 38:11
**convert** [2] - 46:6, 46:9
**COOPER** [1] - 1:4
**Cooper** [18] - 5:17, 8:20, 16:16, 23:20, 29:25, 36:4, 39:10, 43:4, 43:14, 44:8,

45:12, 54:18, 54:23, 55:16, 56:6, 58:21, 59:9, 59:13
**Cooper's** [5] - 12:4, 20:24, 21:16, 22:24, 42:5
**copies** [1] - 42:4
**copy** [3] - 16:14, 17:19, 65:2
**CORPORATION** [1] - 2:11
**correct** [29] - 10:10, 13:21, 15:9, 20:15, 23:2, 25:18, 26:6, 30:14, 35:9, 38:15, 38:24, 43:20, 43:23, 47:4, 47:25, 48:16, 49:16, 49:20, 49:24, 50:16, 50:24, 52:4, 52:12, 52:14, 53:5, 54:19, 56:3, 57:19, 59:21
**counsel** [1] - 4:5
**COUNSEL** [1] - 2:11
**COUNTY** [2] - 3:11, 68:5
**County** [7] - 7:15, 14:3, 14:8, 40:17, 40:22, 43:2, 43:6
**couple** [4] - 5:18, 6:5, 41:5
**course** [2] - 40:16, 40:21
**COURT** [1] - 1:2
**court** [11] - 6:23, 7:9, 8:8, 9:10, 9:11, 46:7, 46:10, 51:18, 61:4, 61:12, 61:22
**Court** [2] - 1:16, 42:25
**courthouse** [1] - 19:10
**create** [1] - 41:16
**credibility** [8] - 54:4, 63:2, 63:9, 63:11, 63:17, 63:21, 63:25, 64:3
**crime** [8] - 24:14, 37:8, 37:10, 43:22, 50:23, 53:16, 54:10, 57:13
**Crimes** [1] - 23:17
**criminal** [13] - 9:10, 9:11, 13:3, 13:4, 15:10, 21:11, 43:14, 46:7, 46:10, 47:20, 52:10, 52:16, 52:19
**Criminal** [1] - 42:25
**cross** [1] - 55:10
**cross-complaint** [1] - 55:10
**CT** [1] - 36:15
**custody** [2] - 9:22, 61:14
**cut** [1] - 43:9
**CW** [12] - 23:21, 24:6, 24:9, 24:18, 24:22, 26:15, 26:17, 39:19, 39:22, 41:24
**CW's** [2] - 26:15, 39:23
**CW-to** [1] - 24:22

**D**

**D_00116** [3] - 16:4, 16:9, 69:11
**D_00119** [3] - 8:2, 8:13, 69:9

**D_00126** [4] - 28:7, 28:10, 28:14, 69:14
**DA's** [1] - 37:9
**Daniel** [3] - 2:21, 55:15, 57:21
**DAT** [42] - 9:14, 9:23, 10:2, 11:2, 11:3, 11:11, 11:17, 11:18, 11:22, 12:23, 13:9, 13:22, 15:16, 15:21, 15:24, 16:15, 16:21, 17:2, 17:7, 17:8, 18:8, 19:20, 20:2, 20:5, 20:7, 20:21, 20:24, 21:10, 21:17, 22:8, 22:24, 23:3, 23:18, 25:17, 33:11, 39:22, 42:5, 55:19, 57:11, 59:18, 60:7, 61:13
**database** [1] - 30:16
**date** [10] - 8:15, 16:11, 22:21, 22:23, 23:14, 24:19, 26:13, 28:11, 41:8, 61:12
**DATs** [6] - 9:20, 10:3, 10:22, 11:7, 11:19, 60:2
**days** [4] - 23:4, 41:5, 48:24, 49:18
**deadline** [1] - 64:11
**deal** [1] - 37:21
**death** [1] - 44:16
**decide** [1] - 63:22
**decides** [1] - 52:7
**decision** [3] - 52:25, 54:24, 63:3
**decline** [12] - 51:9, 51:12, 52:15, 52:23, 54:6, 54:11, 54:25, 55:25, 56:9, 62:7, 63:4, 63:13
**declined** [1] - 53:11
**Def** [1] - 39:22
**defendant** [7] - 13:4, 13:5, 15:11, 18:11, 23:20, 54:9, 57:12
**Defendant** [5] - 2:13, 2:20, 3:5, 44:19, 45:3
**defendant's** [2] - 8:19, 18:2
**Defendant's** [1] - 16:16
**Defendants** [1] - 1:8
**definitely** [2] - 14:17, 50:12
**degree** [7] - 47:20, 47:21, 48:8, 48:11, 48:14, 50:5, 50:18
**DeLUCA** [1] - 2:17
**DELUCA** [1] - 64:16
**Department** [1] - 14:7
**department** [3] - 19:17, 29:2, 29:15
**depicted** [1] - 15:22
**Deponent** [1] - 44:15
**deposition** [12] - 1:14, 4:10, 4:15, 5:20, 5:24, 42:19, 46:2, 46:4, 46:5, 46:16, 68:11, 68:12
**desk** [7] - 9:17, 9:24, 10:11,

12:23, 13:2, 15:6, 15:11
**detailed** [1] - 41:3
**detective** [2] - 34:15, 35:4
**Detective** [1] - 36:2
**determination** [7] - 51:16, 52:15, 52:23, 53:7, 55:24, 56:8, 63:12
**determined** [2] - 44:5, 57:11
**determining** [1] - 53:10
**dialogue** [1] - 32:11
**different** [6] - 18:18, 31:14, 42:20, 59:19, 60:8, 61:15
**differently** [1] - 41:10
**discovery** [2] - 19:19, 62:17
**discuss** [2] - 53:4, 63:19
**discussed** [1] - 56:21
**discussion** [8] - 12:20, 28:19, 29:19, 49:15, 51:3, 58:18, 59:7, 64:23
**dismissing** [1] - 53:22
**distribute** [1] - 10:15
**distributes** [1] - 10:13
**district** [9] - 15:13, 34:24, 52:7, 58:2, 58:8, 59:20, 60:8, 60:12, 61:20
**DISTRICT** [3] - 1:2, 1:2, 3:11
**District** [6] - 7:15, 14:3, 14:8, 40:17, 40:22, 57:14
**dive** [1] - 57:6
**document** [7] - 16:9, 22:22, 30:3, 43:13, 46:6, 46:20, 46:23
**Document** [1] - 69:10
**documentation** [1] - 39:4
**documents** [6] - 12:8, 20:7, 32:2, 33:11, 39:17, 42:21
**done** [2] - 22:8, 60:24
**double** [1] - 33:6
**down** [14] - 7:10, 22:13, 23:20, 24:2, 26:11, 32:23, 34:14, 37:19, 37:22, 38:7, 38:12, 38:20, 39:19, 42:11
**DP** [3] - 53:3, 54:2, 57:4
**draft** [4] - 9:2, 20:11, 32:8, 46:20
**drafted** [3] - 46:23, 46:25, 52:11
**duly** [2] - 5:4, 68:12
**during** [4] - 40:2, 57:10, 58:25, 60:14

### E

**e-Justice** [1] - 19:11
**e-mail** [8] - 12:10, 26:15, 26:20, 27:3, 27:5, 27:10, 27:15, 27:16
  **e-mailed** [1] - 12:12

**e-mails** [6] - 27:18, 27:24, 28:23, 28:25, 29:5, 29:8
**early** [2] - 8:24, 9:4
**easier** [1] - 11:10
**EASTERN** [1] - 1:2
**ECAB** [19] - 14:23, 14:24, 15:4, 22:5, 27:23, 30:6, 30:23, 31:25, 32:16, 32:24, 33:14, 33:23, 37:17, 51:14, 51:16, 52:22, 57:3, 59:24, 60:14
**effectively** [2] - 46:12, 46:24
**eight** [1] - 22:4
**employed** [1] - 7:14
**end** [2] - 15:16, 23:3
**enter** [2] - 31:6, 31:17
**entered** [2] - 30:15, 30:19, 31:14
**entry** [2] - 24:17, 26:12
**envelope** [7] - 15:16, 15:23, 16:18, 16:20, 16:23, 16:24, 17:8
**ERRATA** [1] - 66:3
**especially** [1] - 61:13
**ESQ** [5] - 2:8, 2:10, 2:17, 2:19, 3:9
**et** [2] - 1:7, 62:15
**evaluating** [1] - 56:23
**eventually** [1] - 12:2
**EXAMINATION** [2] - 5:7, 69:5
**examined** [1] - 5:5
**except** [1] - 4:6
**Exhibit** [39] - 8:9, 8:14, 8:16, 11:16, 15:22, 16:7, 16:10, 16:12, 16:19, 20:13, 23:10, 23:13, 23:15, 23:24, 28:5, 28:10, 29:20, 30:14, 31:11, 31:22, 31:23, 32:18, 33:5, 33:17, 34:4, 34:6, 34:7, 35:14, 42:13, 42:14, 43:10, 43:18, 45:23, 47:4, 59:9, 69:8, 69:10, 69:12, 69:13
**EXHIBIT** [1] - 69:7
**exhibit** [2] - 16:3, 42:16
**exhibits** [1] - 8:10
**expediter** [3] - 14:23, 14:24, 15:4
**experience** [1] - 17:12
**explain** [2] - 9:12, 24:24

### F

**face** [3] - 44:20, 45:4, 45:14
**factor** [1] - 62:11
**factors** [2] - 53:10, 56:22
**facts** [2] - 33:16, 40:9, 43:22
**fair** [8] - 14:15, 26:10, 33:5,

37:11, 43:9, 51:15, 60:15, 62:21
**fall** [1] - 7:19
**familiar** [3] - 47:15, 51:6, 51:8
**fantastic** [1] - 64:18
**far** [2] - 29:3, 41:4
**fear** [1] - 45:15
**Federal** [1] - 1:16, 65:3
**felony** [1] - 61:16
**few** [2] - 10:5, 22:16
**fight** [2] - 54:22, 56:6
**figure** [2] - 12:16, 37:20
**figured** [1] - 18:5
**filed** [2] - 52:13, 52:17
**filing** [1] - 4:14
**fill** [1] - 31:10
**final** [3] - 53:6, 53:7, 53:8
**finally** [1] - 7:6
**fine** [1] - 52:3
**finished** [2] - 22:24, 60:8
**finishes** [1] - 6:10
**first** [17] - 5:3, 6:8, 9:3, 9:7, 24:5, 24:17, 36:15, 42:14, 42:21, 42:24, 43:8, 43:10, 43:17, 43:21, 47:3, 61:4, 61:12
**first-hand** [1] - 43:21
**fist** [3] - 44:20, 45:4, 45:13
**flags** [1] - 58:7
**following** [1] - 61:5
**follows** [1] - 5:6
**form** [36] - 4:7, 13:12, 13:17, 17:4, 17:19, 17:22, 17:24, 18:13, 19:4, 21:2, 27:8, 27:21, 30:17, 31:11, 31:18, 32:5, 32:20, 32:24, 34:12, 35:7, 35:20, 35:25, 39:6, 47:8, 48:5, 50:9, 51:23, 53:14, 55:3, 56:12, 58:4, 60:22, 61:8, 62:9, 63:6, 63:15
**forth** [1] - 68:11
**forward** [2] - 62:12, 63:19, 63:23
**fourth** [1] - 47:21
**friends** [3] - 26:16, 26:21, 26:24
**front** [3] - 16:20, 16:23, 39:5
**frontal** [1] - 19:16
**full** [1] - 19:16
**full-body** [1] - 19:16
**FURTHER** [2] - 4:9, 4:13
**future** [2] - 46:23, 58:8
**fuzzy** [1] - 16:3
**fuzzy-looking** [1] - 16:3

### G

**gathered** [1] - 15:7
**general** [1] - 60:5
**generally** [2] - 17:11, 34:24
**generated** [2] - 30:5, 31:19
**generates** [1] - 33:19
**gestures** [1] - 7:9
**given** [3] - 5:25, 11:21, 68:13
**glaring** [1] - 57:4
**glasses** [1] - 39:23
**goal** [1] - 61:9
**GOLDSMITH** [1] - 2:19
**great** [1] - 6:9
**ground** [1] - 6:5
**guess** [2] - 36:9, 60:23
**gunpoint** [1] - 59:14
**guys** [1] - 64:18

### H

**half** [1] - 64:10
**hand** [2] - 43:5, 43:21
**handles** [2] - 58:9, 59:20
**handling** [1] - 61:21
**hands** [2] - 7:8, 54:10
**harassment** [1] - 48:13
**hard** [1] - 12:7
**head** [1] - 59:12
**heads** [1] - 7:9
**held** [8] - 12:20, 28:19, 29:19, 49:15, 51:3, 58:18, 59:7, 64:23
**help** [1] - 6:6
**hereby** [1] - 68:9
**HEREBY** [1] - 4:4
**hereinbefore** [1] - 68:11
**hereto** [1] - 4:6
**high** [1] - 25:22
**higher** [1] - 47:13
**history** [1] - 62:4
**hold** [1] - 64:19
**honestly** [3] - 17:10, 18:2, 37:17
**hopefully** [1] - 7:25
**host** [1] - 53:25
**hotline** [1] - 37:9
**hour** [1] - 64:10
**HUGHES** [4] - 1:15, 5:2, 67:9, 68:10
  **Hughes** [20] - 3:12, 5:11, 5:15, 5:19, 8:17, 8:21, 18:20, 20:19, 21:9, 23:21, 24:20, 26:14, 27:10, 28:22, 29:10, 49:16, 51:8, 58:19, 59:8, 69:6
**hurt** [1] - 50:12
**hyper** [1] - 25:15

**hypotheticals** [1] - 56:17

**I**

**Iacobellis** [2] - 1:18, 68:7
**IACOBELLIS** [1] - 68:22
**ID** [1] - 18:4
**idea** [1] - 35:3
**identification** [4] - 8:14, 16:10, 23:13, 28:11
**identified** [1] - 30:22
**identify** [5] - 8:16, 16:12, 23:15, 29:21, 42:14
**implication** [1] - 26:23
**inbox** [2] - 27:6, 27:25
**incarcerated** [1] - 61:17
**incident** [2] - 26:24, 41:6
**included** [5] - 16:25, 33:17, 37:16, 44:8, 59:2
**incredible** [1] - 64:6
**independent** [1] - 25:11
**INDEX** [1] - 69:3
**indicate** [1] - 42:7
**indicates** [2] - 58:21, 59:9
**indicating** [1] - 38:9
**info** [1] - 26:15
**informant** [3] - 44:19, 44:23, 45:11
**information** [39] - 13:9, 20:11, 22:17, 26:21, 27:15, 28:6, 28:9, 29:14, 29:23, 30:7, 30:15, 30:18, 31:6, 31:15, 31:17, 31:24, 32:15, 32:17, 33:16, 40:4, 40:13, 41:11, 41:13, 43:25, 44:4, 45:19, 46:8, 46:11, 55:25, 56:5, 56:10, 58:6, 58:25, 59:16, 59:19, 60:13, 62:19, 62:22, 69:14
**informed** [1] - 44:15
**initial** [1] - 22:18
**initiated** [1] - 56:6
**injured** [1] - 54:23
**injuries** [1] - 41:21
**injury** [2] - 45:16, 50:6
**inkling** [1] - 53:2
**input** [1] - 30:7
**inside** [4] - 16:24, 17:7, 32:23, 33:14
**instances** [4] - 32:22, 52:5, 60:17, 61:18
**instead** [2] - 31:14, 31:17
**instigated** [1] - 54:22
**instrument** [4] - 9:3, 20:12, 43:11, 46:11
**intake** [2] - 9:2, 9:13
**interest** [2] - 53:17, 53:23
**interested** [2] - 60:5, 68:18
**interview** [10] - 26:14, 32:16, 34:2, 38:18, 38:23,

38:25, 39:3, 40:2, 60:19, 61:3
**interviewed** [3] - 38:8, 39:8, 61:20
**interviews** [5] - 33:12, 40:8, 43:25, 57:10, 58:25
**investigate** [1] - 57:7
**investigated** [2] - 57:13, 58:2
**investigation** [1] - 57:2
**IS** [3] - 4:4, 4:9, 4:13
**issue** [7] - 18:16, 58:8, 63:9, 63:11, 63:17, 63:22, 64:2
**issues** [2] - 63:2, 64:3
**IT** [4] - 4:4, 4:9, 4:13, 29:2
**itself** [2] - 34:7, 44:10

**J**

**Jacobs** [20] - 3:6, 23:22, 26:18, 27:14, 34:3, 38:21, 39:9, 39:13, 41:13, 42:19, 44:24, 45:2, 45:11, 45:20, 46:15, 54:19, 54:22, 56:5, 57:24, 59:12
**Jacobs'** [1] - 44:16
**jail** [2] - 48:17, 48:19
**JAMES** [2] - 2:10, 3:9
**Jay** [2] - 3:13, 5:13
**job** [1] - 6:9
**JOHN** [1] - 3:15
**JOHNSON** [1] - 2:10
**jump** [3] - 6:12, 12:7, 64:12
**Justice** [1] - 19:11
**justice** [2] - 53:17, 53:23

**K**

**K16621359** [1] - 30:2
**KARASYK** [1] - 3:4
**kept** [1] - 40:16
**kind** [7] - 9:18, 9:22, 10:16, 11:8, 19:7, 23:25, 56:17
**Kings** [7] - 7:15, 14:3, 14:8, 40:17, 40:22, 43:2, 43:6
**KINGS** [2] - 3:11, 68:5
**knowledge** [2] - 43:21, 46:13
**known** [2] - 56:9, 57:23
**KOTKES** [1] - 3:18

**L**

**L-A-P-S** [1] - 14:11
**labelled** [1] - 30:10
**Lane** [4] - 34:17, 34:23, 35:4, 36:3
**LAPS** [5] - 14:11, 14:12,

14:18, 14:19, 15:12
**largely** [1] - 59:24
**last** [2] - 7:6, 41:8
**law** [6] - 6:23, 7:21, 49:7, 50:11, 50:13, 62:17
**least** [1] - 13:25
**letters** [3] - 36:10, 36:16
**level** [2] - 21:18, 47:12
**Lieutenant** [3] - 36:11, 36:13, 57:24
**light** [1] - 54:21
**likely** [2] - 42:9, 59:4
**line** [6] - 24:5, 33:6, 37:19, 40:3, 40:5, 64:19
**lines** [1] - 26:2
**list** [1] - 37:23
**listed** [3] - 8:21, 41:8, 47:5
**listening** [1] - 52:6
**live** [4] - 9:21, 9:25, 15:4, 15:7
**LLP** [1] - 3:4
**local** [1] - 14:13
**look** [3] - 30:13, 35:12, 38:7
**looked** [1] - 36:15
**looking** [8] - 8:4, 11:9, 11:15, 16:3, 16:5, 23:8, 31:22, 44:17
**looks** [2] - 24:21, 31:11
**lower** [1] - 47:14
**lucky** [1] - 58:15

**M**

**mail** [8] - 12:10, 26:15, 26:20, 27:3, 27:5, 27:10, 27:15, 27:16
**mailed** [1] - 12:12
**mails** [6] - 27:18, 27:24, 28:23, 28:25, 29:5, 29:8
**manilla** [1] - 16:23
**March** [3] - 9:13, 13:14, 41:7
**MARIE** [1] - 68:22
**Marie** [2] - 1:18, 68:7
**marijuana** [1] - 53:22
**mark** [4] - 8:8, 16:6, 23:10, 28:5
**marked** [6] - 8:13, 11:16, 16:10, 23:13, 28:10, 35:14
**marriage** [1] - 68:17
**materials** [5] - 13:22, 13:25, 14:6, 15:12, 16:25
**matter** [3] - 60:6, 61:16, 68:18
**maximum** [4] - 48:22, 49:17, 49:21, 49:25
**mean** [27] - 10:14, 13:17, 15:15, 18:9, 18:17, 18:18, 19:22, 20:9, 21:4, 21:18, 32:7, 33:2, 36:13, 36:17,

47:9, 48:25, 49:6, 50:7, 51:11, 53:20, 53:21, 53:24, 56:14, 56:17, 57:15, 58:10, 60:23
**meaning** [2] - 6:23, 27:19
**means** [5] - 24:9, 24:25, 45:2, 51:12, 52:10
**measures** [1] - 26:3
**mechanism** [2] - 29:3, 29:12
**memo** [2] - 17:19, 17:20
**menacing** [1] - 48:10
**MG** [2] - 36:11, 36:13
**might** [13] - 11:10, 11:12, 22:16, 25:22, 25:24, 27:24, 33:21, 33:22, 53:3, 55:19, 56:25, 62:11
**minutes** [1] - 58:13
**mischief** [1] - 47:21
**misconduct** [2] - 62:5, 62:14
**misdemeanor** [6] - 48:8, 48:9, 48:12, 49:21, 49:25
**misdemeanors** [2] - 47:24, 48:3
**misspoke** [1] - 59:11
**Mona** [2] - 38:13, 38:16
**month** [1] - 41:9
**months** [1] - 49:22
**MOSCHELLA** [3] - 3:4, 3:9, 64:17
**motion** [1] - 52:20
**move** [2] - 63:19, 63:23
**moving** [3] - 45:7, 51:4, 62:12
**MR** [79] - 5:8, 8:7, 12:6, 12:11, 12:14, 12:15, 12:22, 13:11, 13:16, 13:19, 15:20, 16:6, 17:3, 17:5, 18:12, 18:14, 18:17, 19:3, 20:22, 20:25, 21:6, 22:7, 23:9, 27:7, 27:9, 27:20, 28:4, 28:15, 28:17, 28:20, 29:16, 31:16, 32:4, 32:19, 34:11, 35:6, 35:19, 35:21, 35:24, 38:3, 39:6, 39:7, 41:17, 42:12, 45:9, 47:7, 48:4, 48:25, 49:3, 49:5, 49:9, 49:12, 50:8, 50:25, 51:4, 51:7, 51:22, 52:3, 53:13, 54:15, 55:2, 56:11, 57:9, 58:3, 58:12, 59:5, 60:21, 61:7, 62:8, 63:5, 63:14, 64:8, 64:16, 64:17, 64:18, 64:24, 65:4, 65:7, 65:10
**mugshot** [5] - 18:10, 18:11, 18:18, 19:2, 19:8
**mugshots** [1] - 18:7
**multiple** [1] - 23:4
**must** [1] - 46:12

## N

**name** [15] - 5:9, 5:15, 8:19, 10:7, 10:8, 14:5, 16:16, 18:3, 21:9, 23:19, 25:10, 31:2, 37:12, 37:16
**named** [1] - 55:15
**narcotics** [4] - 17:18, 35:10, 35:15, 35:17
**narrative** [1] - 56:20
**near** [2] - 41:2, 41:12
**necessarily** [4] - 7:10, 26:4, 56:25, 61:11
**necessary** [2] - 46:9, 50:6
**need** [9] - 7:11, 10:12, 13:9, 13:22, 20:10, 49:7, 49:10, 56:25, 57:5
**needed** [1] - 10:5
**never** [2] - 18:4, 52:11
**NEW** [4] - 1:2, 1:7, 2:12, 68:3
**new** [1] - 62:17
**New** [19] - 1:19, 2:7, 2:14, 2:16, 2:23, 3:8, 3:14, 5:5, 5:13, 14:7, 29:25, 42:25, 43:3, 43:5, 68:9
**next** [2] - 11:6, 23:19
**nice** [3] - 6:6, 6:12, 7:11
**nobody** [1] - 61:14
**non** [1] - 11:3
**non-assault** [1] - 11:3
**Notary** [3] - 1:19, 5:4, 68:8
**notation** [2] - 25:3, 59:13
**note** [3] - 25:5, 59:22, 65:11
**notes** [1] - 34:2
**nothing** [1] - 6:25
**November** [3] - 1:9, 66:2, 69:2
**number** [8] - 8:2, 8:13, 18:4, 24:21, 30:2, 36:14, 55:17, 69:9
**NYPD** [4] - 14:2, 14:20, 18:21, 19:6

## O

**O'Connor** [3] - 2:21, 55:15, 57:21
**oath** [2] - 4:12, 46:16
**object** [1] - 6:15
**Objection** [1] - 20:25
**objection** [28] - 13:11, 13:16, 17:3, 18:12, 19:3, 27:7, 27:20, 32:4, 32:19, 34:11, 35:6, 35:19, 35:24, 39:6, 47:7, 48:4, 48:25, 50:8, 51:22, 53:13, 55:2, 56:11, 58:3, 60:21, 61:7, 62:8, 63:5, 63:14
**objections** [1] - 4:6

**obtained** [1] - 60:14
**obviously** [2] - 53:18, 55:23
**OF** [6] - 1:2, 1:7, 2:11, 2:12, 68:3, 68:5
**off-the-record** [8] - 12:19, 28:18, 29:18, 49:14, 51:2, 58:17, 59:6, 64:22
**offenses** [1] - 47:5
**OFFICE** [1] - 3:11
**Office** [4] - 7:16, 14:3, 14:8, 57:14
**office** [3] - 6:21, 53:20, 59:24
**Office's** [1] - 40:17
**officer** [16] - 4:11, 14:21, 17:11, 17:21, 19:15, 25:8, 25:9, 25:12, 25:14, 25:19, 25:21, 25:25, 26:5, 26:7, 26:9, 62:4
**officer's** [1] - 18:3
**officers** [1] - 25:6
**official** [1] - 36:19
**officials** [1] - 36:7
**often** [2] - 18:25, 60:13
**OmniForm** [2] - 17:13
**once** [1] - 19:23
**one** [13] - 10:4, 11:6, 15:17, 15:21, 25:13, 25:18, 26:4, 28:16, 30:21, 38:20, 50:2, 55:7, 58:21
**ones** [2] - 47:13, 47:14
**order** [4] - 13:22, 47:6, 50:4, 50:17
**Order** [1] - 1:16
**ordinary** [1] - 40:16
**otherwise** [1] - 57:5
**outcome** [1] - 68:18
**Outlook** [1] - 27:25
**overtime** [2] - 25:22, 26:2
**own** [2] - 28:23, 28:25

## P

**p.m** [2] - 1:10, 65:11
**Package** [1] - 16:15
**package** [5] - 14:6, 17:8, 18:8, 21:10, 33:11
**packaging** [1] - 11:25
**packet** [5] - 14:10, 15:24, 16:19, 20:2, 20:6
**PAGE** [2] - 69:5, 69:7
**page** [10] - 42:14, 42:22, 42:24, 43:6, 43:8, 43:10, 43:17, 45:23, 47:3
**PAGE/LINE** [1] - 66:5
**pain** [4] - 45:15, 50:14, 50:19, 50:22
**paper** [2] - 16:15, 53:21
**paperwork** [5] - 9:9, 10:20, 14:20, 26:9, 40:8

**paragraph** [4] - 41:19, 44:14, 45:8, 45:10
**paralegal** [1] - 10:17
**part** [14] - 8:24, 14:17, 18:8, 19:15, 19:19, 20:7, 30:5, 30:23, 32:12, 33:21, 43:2, 57:10, 58:10, 62:5
**PARTICIPANTS** [1] - 2:2
**parties** [2] - 4:6, 68:16
**pens** [1] - 19:18
**people** [2] - 9:8, 29:11, 29:12
**People** [2] - 29:24, 43:3
**period** [1] - 27:19
**person** [9] - 9:21, 10:22, 15:2, 18:22, 24:13, 26:4, 26:8, 37:6
**personal** [2] - 12:10, 17:17, 46:13
**persons** [1] - 23:18
**phone** [1] - 36:14
**phones** [1] - 19:17
**photo** [1] - 19:6
**photograph** [2] - 18:22, 28:25
**photos** [2] - 42:5, 42:8
**photos)** [1] - 41:25
**phrase** [2] - 47:15, 51:9
**physical** [1] - 45:16
**pick** [2] - 9:23, 11:4
**picks** [1] - 15:17
**piece** [2] - 16:14, 40:12
**place** [2] - 39:4, 44:19
**Plaintiff** [4] - 1:5, 1:15, 2:5, 5:16
**PLLC** [1] - 2:4
**point** [4] - 10:21, 20:10, 46:22, 64:4
**pointing** [1] - 28:21
**Police** [1] - 14:7
**police** [4] - 9:2, 37:8, 57:23, 62:4
**pops** [2] - 32:10, 33:23
**potential** [2] - 13:4, 15:10
**practice** [4] - 46:6, 59:23, 60:25, 61:2
**pre** [1] - 20:3
**pre-arraignment** [1] - 20:3
**precinct** [1] - 19:18
**preliminary** [1] - 9:9
**prepare** [1] - 30:4
**PRESENT** [1] - 3:17
**preserve** [1] - 27:18
**preserving** [1] - 65:4
**presuming** [1] - 36:13
**previously** [1] - 35:14
**principally** [1] - 9:6
**print** [1] - 31:7
**printed** [4] - 30:11, 30:18, 32:25, 33:2
**priority** [1] - 9:20

**prison** [3] - 49:18, 49:22, 50:2
**problems** [1] - 54:4
**Procedure** [1] - 1:17
**procedure** [2] - 9:13, 11:21
**proceeded** [1] - 56:7
**proceeding** [1] - 51:13
**process** [11] - 10:18, 13:10, 13:22, 21:5, 21:7, 21:10, 30:24, 60:7, 60:9, 60:14, 62:19
**processed** [2] - 10:13, 20:24
**processes** [1] - 15:13
**processing** [4] - 13:5, 14:14, 14:16, 20:7
**profile** [1] - 19:16
**program** [14] - 30:6, 30:8, 30:23, 31:3, 31:7, 31:25, 32:8, 32:12, 32:16, 33:15, 33:22, 37:18, 41:9, 47:11
**promise** [1] - 64:11
**property** [1] - 17:17
**prosecute** [16] - 51:9, 51:12, 51:17, 52:16, 52:23, 53:12, 54:7, 54:12, 54:25, 55:25, 56:9, 62:7, 63:4, 63:13, 63:23, 64:5
**prosecution** [2] - 52:20, 61:21
**protocol** [2] - 18:21, 19:15
**proven** [1] - 54:4
**provided** [6] - 7:25, 13:3, 14:2, 32:17, 35:13, 59:19
**Public** [3] - 1:19, 5:4, 68:8
**pull** [5] - 7:23, 16:2, 23:6, 28:3, 28:13
**pulling** [1] - 12:8
**punched** [1] - 39:22
**purpose** [2] - 18:5, 23:23
**pursuant** [2] - 1:15, 65:3
**put** [4] - 10:23, 39:4, 56:19, 58:11
**puts** [1] - 15:15
**putting** [1] - 58:6

## Q

**questions** [7] - 5:18, 22:15, 22:16, 49:4, 64:12, 64:16, 64:17
**quickly** [1] - 12:17

## R

**rambling** [1] - 6:10
**rather** [1] - 13:5
**re** [3] - 60:19, 61:3, 61:20
**re-interview** [2] - 60:19, 61:3

**re-interviewed** [1] - 61:20
**reach** [1] - 61:10
**read** [4] - 22:14, 24:16, 26:12, 36:9
**reading** [1] - 25:2
**ready** [1] - 14:22
**really** [4] - 12:17, 20:10, 44:13, 61:25
**reason** [6] - 25:4, 38:18, 46:18, 54:6, 54:11, 58:10
**reasons** [1] - 53:25
**receive** [3] - 27:5, 43:24, 59:15
**received** [6] - 27:2, 33:11, 41:13, 44:5, 56:5, 58:24
**recollection** [2] - 25:11, 38:11
**record** [27] - 5:10, 8:17, 12:18, 12:19, 16:13, 23:16, 28:16, 28:18, 28:20, 29:18, 29:21, 40:25, 41:10, 42:15, 49:13, 49:14, 50:25, 51:2, 51:5, 58:13, 58:17, 59:5, 59:6, 64:21, 64:22, 64:25, 68:13
**recorded** [1] - 32:15
**redness** [2] - 41:24, 45:13
**refer** [1] - 42:21
**referred** [1] - 18:25
**reflect** [1] - 39:25
**reflected** [4] - 32:2, 34:4, 35:11, 39:16
**regarding** [2] - 32:15, 36:3
**related** [2] - 17:17, 68:16
**rely** [1] - 60:13
**remaining** [1] - 48:2
**remember** [1] - 30:9
**REMOTE** [1] - 2:2
**remotely** [1] - 1:17
**rephrase** [2] - 13:20, 50:15
**report** [2] - 17:13, 17:14
**reported** [3] - 1:17, 37:7, 37:10
**reporter** [5] - 7:10, 8:8, 37:4, 37:6, 37:13
**Reporter** [6] - 1:18, 8:15, 16:11, 23:14, 28:12, 68:8
**reporters** [2] - 37:2, 40:6
**represent** [1] - 5:16
**request** [2] - 19:11, 37:20
**reserved** [1] - 4:7
**respect** [2] - 36:20, 39:9
**respective** [1] - 4:5
**responsible** [1] - 21:21
**responsiveness** [1] - 62:2
**result** [1] - 24:25
**results** [1] - 24:22
**retrieve** [3] - 29:5, 29:7, 29:9
**review** [2] - 19:11, 65:5
**RICKNER** [39] - 2:4, 2:8,

5:8, 8:7, 12:11, 12:15, 12:22, 13:19, 15:20, 16:6, 17:5, 18:14, 20:22, 21:6, 22:7, 23:9, 27:9, 28:4, 28:17, 29:16, 31:16, 35:21, 38:3, 39:7, 41:17, 42:12, 45:9, 49:3, 49:9, 51:4, 51:7, 52:3, 54:15, 57:9, 58:12, 64:8, 64:18, 65:4, 65:10
**Rickner** [3] - 5:16, 12:6, 69:6
**right-hand** [1] - 43:5
**rise** [1] - 64:4
**ROB** [1] - 2:8
**Rob** [1] - 5:15
**robbed** [1] - 59:14
**role** [5] - 14:25, 15:3, 34:19, 34:21, 57:2
**room** [22] - 7:24, 8:12, 8:18, 8:22, 8:23, 11:15, 22:6, 23:7, 23:12, 23:18, 29:23, 30:16, 31:8, 36:23, 39:11, 40:15, 40:21, 41:12, 58:20, 59:2, 69:8, 69:12
**ROSE** [1] - 68:22
**Rose** [2] - 1:17, 68:7
**roughly** [1] - 47:5
**routine** [1] - 40:21
**Rules** [1] - 1:16
**rules** [2] - 6:6, 6:22
**Ryan** [4] - 34:17, 34:23, 35:3, 36:3

---

## S

**SA** [1] - 17:23
**save** [3] - 28:24, 29:11
**saved** [4] - 27:19, 27:24, 28:22, 29:13
**saves** [1] - 29:10
**school** [1] - 7:21
**screen** [5] - 9:6, 20:14, 20:16, 38:8, 57:3
**screened** [2] - 42:5, 59:18
**screener** [3] - 8:21, 20:18, 53:2
**screening** [39] - 7:24, 8:12, 8:19, 11:16, 21:13, 21:16, 21:22, 22:8, 22:11, 22:20, 22:24, 30:6, 30:17, 31:5, 31:7, 31:8, 31:25, 32:7, 32:16, 32:18, 32:24, 33:14, 36:23, 40:15, 40:21, 41:8, 41:12, 55:11, 55:14, 56:20, 57:11, 57:16, 57:20, 58:7, 58:11, 58:20, 59:3, 60:7, 69:9
**sealing** [1] - 4:14
**SEAN** [4] - 1:14, 5:2, 67:9, 68:10
**Sean** [5] - 3:12, 5:11, 8:21,

20:18, 69:6
**search** [1] - 53:19
**second** [10] - 28:16, 41:20, 42:22, 43:6, 45:7, 45:10, 45:22, 48:14, 58:14, 64:20
**section** [4] - 24:5, 24:25, 36:7, 36:25, 39:21, 40:7
**see** [12] - 7:8, 12:16, 24:6, 24:8, 33:24, 34:15, 34:18, 36:8, 37:2, 38:13, 42:2, 44:21
**send** [2] - 12:9, 65:2
**sense** [2] - 10:18, 36:15
**sent** [1] - 12:9
**sentence** [7] - 41:20, 44:13, 44:23, 48:22, 49:17, 49:21, 49:25
**separate** [2] - 32:10, 34:2
**separately** [1] - 33:19
**sequential** [1] - 8:9
**sergeant** [2] - 25:22, 25:24
**serves** [1] - 18:5
**set** [4] - 34:2, 51:20, 52:20, 68:11
**sets** [1] - 36:10
**several** [1] - 61:22
**severity** [1] - 47:6
**sheet** [42] - 7:24, 8:12, 8:19, 11:16, 17:15, 20:14, 20:16, 22:11, 23:7, 23:12, 23:19, 24:2, 25:7, 25:10, 28:6, 28:9, 29:23, 30:10, 30:17, 31:8, 32:18, 33:23, 36:23, 38:8, 38:17, 39:12, 39:20, 40:16, 40:21, 41:12, 55:11, 55:14, 56:20, 57:16, 57:20, 58:7, 58:11, 58:20, 59:3, 69:9, 69:12, 69:14
**shift** [2] - 10:4, 22:4
**shifts** [1] - 10:5
**Shorthand** [2] - 1:18, 68:7
**shot** [1] - 19:16
**show** [1] - 16:19
**Shrell** [1] - 25:8
**side** [1] - 43:5
**sign** [3] - 43:17, 46:15, 65:5
**signed** [6] - 4:10, 21:11, 21:23, 46:12, 46:25, 52:25
**simply** [1] - 27:6
**sit** [3] - 9:19, 22:13, 27:24
**sitting** [1] - 36:18
**Sofia** [1] - 10:8
**SOFIA** [1] - 10:8
**solely** [1] - 21:21
**someone** [6] - 15:15, 51:17, 55:15, 56:18, 57:8, 61:16
**sometimes** [11] - 11:9, 17:16, 17:18, 18:7, 19:14, 25:16, 25:21, 37:17, 53:16, 53:18, 61:24
**somewhere** [3] - 32:25,

33:3, 39:17
**soon** [1] - 61:10
**sorry** [6] - 24:20, 30:20, 42:16, 42:17, 43:8, 52:2
**sort** [1] - 53:17
**sorts** [1] - 47:11
**South** [1] - 35:17
**speaking** [1] - 17:11
**specific** [8] - 11:2, 11:20, 13:13, 18:15, 33:4, 40:3, 51:20, 54:16
**specifically** [4] - 9:16, 10:20, 14:25, 60:6
**spoken** [2] - 38:10, 39:15
**ss** [1] - 68:4
**stack** [1] - 9:19
**staff** [1] - 9:10
**staffed** [1] - 14:19
**staffing** [1] - 26:3
**stage** [4] - 19:21, 51:14, 51:16, 52:22
**Stamp** [4] - 28:7, 28:10, 28:14, 69:14
**Stamped** [3] - 16:4, 16:9, 69:10
**stands** [2] - 12:23, 14:12
**stapled** [1] - 16:22
**start** [5] - 7:18, 7:20, 18:15, 50:7, 50:11
**started** [1] - 7:19
**starts** [2] - 43:15, 47:12
**state** [1] - 5:9
**State** [6] - 1:19, 5:5, 29:24, 43:3, 43:5, 68:9
**STATE** [1] - 68:3
**statements** [2] - 32:23, 39:25
**STATES** [1] - 1:2
**step** [1] - 55:21
**Steve** [2] - 38:13, 59:13
**Steven** [9] - 5:16, 8:20, 16:16, 23:20, 29:25, 36:4, 39:10, 43:4, 45:3
**STEVEN** [1] - 1:4
**still** [1] - 49:10
**STIPULATED** [3] - 4:4, 4:9, 4:13
**STIPULATIONS** [1] - 4:2
**Street** [3] - 2:15, 3:13, 5:13
**struck** [4] - 44:19, 45:4, 45:12, 54:18
**stuff** [1] - 56:23
**submit** [2] - 21:23, 22:19
**submitted** [1] - 21:12
**submitting** [1] - 11:25
**Subscribed** [1] - 67:13
**substantial** [4] - 45:15, 50:14, 50:18, 50:22
**substantiated** [1] - 62:15
**successfully** [1] - 25:3
**suffer** [3] - 45:13, 45:15,

50:13
**suffered** [1] - 41:24
**sufficient** [1] - 20:11
**Suite** [2] - 2:22, 3:7
**summary** [3] - 33:7, 33:10, 40:7
**super** [3] - 17:19, 17:22, 17:23
**supervisor** [4] - 21:24, 22:2, 22:10, 63:18
**supervisors** [1] - 22:4
**supporting** [5] - 42:19, 45:25, 46:4, 46:5, 46:16
**suppose** [2] - 10:18, 41:4
**sworn** [5] - 4:10, 5:4, 46:12, 67:13, 68:12
**system** [1] - 31:18

## T

**tax** [1] - 18:4
**technical** [1] - 25:15
**technology** [1] - 29:15
**tel** [1] - 24:20
**Tel** [1] - 26:14
**telephone** [2] - 38:9, 39:2
**testified** [2] - 5:6, 5:22
**testifying** [2] - 6:20, 6:23
**testimony** [1] - 68:13
**THE** [15] - 2:12, 32:21, 35:8, 47:9, 48:6, 50:10, 51:24, 53:15, 55:4, 58:5, 60:23, 61:9, 62:10, 63:7, 64:14
**therefore** [1] - 52:19
**thinking** [1] - 59:12
**third** [7] - 44:13, 44:14, 47:20, 48:7, 48:10, 50:5, 50:18
**Thomas** [17] - 3:6, 23:22, 26:17, 27:14, 34:3, 38:21, 39:9, 41:13, 44:16, 44:24, 45:2, 45:11, 45:20, 46:15, 56:5, 57:24, 59:12
**three** [3] - 37:23, 49:10, 49:22
**ticket** [4] - 12:24, 13:2, 15:6, 15:11
**tickets** [2] - 9:18, 10:12
**titled** [1] - 16:15
**today** [1] - 36:18
**together** [2] - 31:23, 32:3
**took** [1] - 39:4
**top** [8] - 23:17, 25:10, 29:22, 43:7, 47:16, 47:18, 47:19, 47:22
**tracking** [6] - 23:7, 23:12, 23:18, 39:12, 39:20, 69:12
**transactions** [1] - 41:2
**transcript** [1] - 6:7
**trial** [3] - 4:8, 5:22, 49:11

**true** [1] - 68:13
**truth** [4] - 6:24, 6:25, 54:5
**two** [7] - 32:2, 36:9, 36:10, 42:20, 49:3, 55:8, 58:13
**typically** [2] - 25:13, 37:12

## U

**ultimately** [6] - 15:13, 21:11, 51:17, 52:24, 58:9, 60:9
**unavailable** [1] - 38:19
**under** [4] - 24:19, 39:19, 46:16, 62:16
**underlying** [2] - 33:16, 43:22
**underneath** [4] - 24:5, 24:17, 33:5, 36:6
**understand** [5] - 6:16, 7:2, 7:12, 42:20, 54:13
**understood** [3] - 18:6, 29:16, 57:18
**underway** [1] - 19:23
**unfortunately** [1] - 16:3
**UNITED** [1] - 1:2
**unless** [1] - 64:11
**unsigned** [1] - 22:12
**up** [27] - 7:23, 9:8, 9:23, 11:5, 11:6, 11:11, 11:25, 12:8, 15:16, 15:17, 16:2, 16:19, 23:3, 23:6, 25:25, 28:3, 28:13, 28:23, 32:10, 33:23, 49:9, 51:25, 55:18, 56:7, 58:16
**uploaded** [1] - 19:10

## V

**V-A-S-I-L-I-S** [1] - 38:6
**Vasilis** [1] - 38:5
**verbal** [1] - 7:11
**verbatim** [1] - 32:17
**versus** [2] - 11:11, 43:4
**vertical** [1] - 59:25
**victim** [2] - 54:9, 57:12
**Victor** [1] - 17:23
**Videoconference** [1] - 1:14
**view** [1] - 19:16
**violation** [5] - 48:15, 48:17, 48:20, 48:23, 49:17
**vouchers** [1] - 17:16
**VSA** [1] - 17:18

## W

**wait** [1] - 6:9
**waived** [1] - 4:15
**walk** [1] - 11:4
**weapons** [1] - 17:17

**week** [1] - 22:4
**whole** [2] - 6:24, 53:25
**Withdrawn** [1] - 38:3
**withdrawn** [14] - 12:22, 15:20, 17:5, 20:22, 22:7, 27:9, 31:16, 39:7, 41:17, 42:12, 45:9, 51:7, 54:15, 57:9
**Witness** [1] - 69:13
**WITNESS** [15] - 32:21, 35:8, 47:9, 48:6, 50:10, 51:24, 53:15, 55:4, 58:5, 60:23, 61:9, 62:10, 63:7, 64:14, 69:5
**witness** [27] - 5:3, 9:8, 24:10, 24:12, 24:13, 28:6, 28:9, 29:23, 32:23, 38:10, 38:13, 40:12, 41:14, 43:25, 52:6, 54:3, 54:11, 60:19, 61:3, 61:10, 61:19, 62:3, 63:2, 63:16, 64:6, 68:10, 68:14
**witnesses** [6] - 26:24, 30:8, 34:9, 37:23, 38:2, 44:9
**woman** [2] - 9:17, 10:6
**wondering** [1] - 33:25
**wonky** [1] - 37:18
**word** [1] - 21:7
**wrap** [1] - 58:15
**write** [9] - 9:8, 9:9, 9:23, 9:25, 11:11, 24:2, 25:25, 32:23, 40:9
**writing** [1] - 11:24
**written** [2] - 39:18, 40:11
**wrote** [2] - 24:21, 55:18

## X

**X-Y-D-I-A-S** [1] - 38:6
**Xydias** [1] - 38:5

## Y

**year** [1] - 50:2
**yellow** [4] - 15:16, 15:22, 16:18, 17:8
**Yitzchok** [1] - 58:14
**YITZCHOK** [1] - 3:18
**YORK** [4] - 1:2, 1:7, 2:12, 68:3
**York** [19] - 1:19, 2:7, 2:14, 2:16, 2:23, 3:8, 3:14, 5:5, 5:14, 14:7, 29:25, 42:25, 43:4, 43:6, 68:9
**yourself** [1] - 21:16

## Z

**Zoom** [2] - 6:21, 7:7