**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**STEVEN COOPER,**

                                    Plaintiff,

            vs.

**CITY OF NEW YORK, et al.**

                                    Defendants.

**Index No. 17-CV-01517**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR
SUMMARY JUDGMENT BY DEFENDANT JACOB AND THE MOTION FOR
SUMMARY JUDGMENT BY THE CITY DEFENDANTS**

RICKNER PLLC
14 Wall Street, Suite 1603
New York, NY 10005

LAW OFFICES OF YITZCHOK KOTKES, P.C.
1225 Franklin Ave Ste 325
Garden City, NY 11530

On the Brief:

        Robert Rickner, Esq.
        Yitzchok Kotkes, Esq.

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ...................................................................................................... i

**DESCRIPTION OF PLAINTIFF'S  SUBMISSIONS & CITATIONS** ............................... iii

    I.    Plaintiff's Combined Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment ........................................................................................................ iii

    II.   Plaintiff's Responses to Defendants' 56.1 Statements ................................................. iii

    III.  Declaration of Robert Rickner and Attached Exhibits ................................................. iii

**TABLE OF AUTHORITIES** ............................................................................................... iv

**PRELIMINARY STATEMENT** ............................................................................................ 1

**STATEMENT OF FACTS** ..................................................................................................... 2

    a.    The Assault on Steven Cooper .................................................................................... 2

    b.    The Police Response ................................................................................................... 3

    c.    The Conspiracy to Frame Cooper ............................................................................... 4

    d.    The Prosecution Against Cooper ................................................................................ 6

**ARGUMENT** .......................................................................................................................... 7

  I.    Defendants completely ignore the summary judgment standard and most of their arguments rely on facts that are obviously in dispute. ........................................................ 7

  II.   There are disputes of material fact as to whether there was probable cause to arrest Cooper, so the motion to summarily dismiss the false arrest claims, under both state and federal law, should be denied. ......................................................................................... 9

    a.    Legal Standard .......................................................................................................... 9

    b.    There Was No Probable Cause to Arrest Cooper at the Scene ...................................... 9

    c.    Marijuana Possession Was Not a Crime, So It Cannot Justify an Arrest .................... 12

  III.  There is enough circumstantial evidence of a conspiracy to have Cooper wrongfully prosecuted to create an issue of fact for the jury. ............................................................. 13

    a.    Legal Standard ........................................................................................................ 13

    b.    Circumstantial Evidence of the Conspiracy Creates Triable Issues of Fact ................ 14

IV.   Defendants are not entitled to qualified immunity. .......................................................... 19

V.    Jacobs was acting under color of law. ................................................................................ 20

VI.   This Court should continue to exercise jurisdiction over the state law claims. ................ 24

**CONCLUSION** .................................................................................................................... **25**

## DESCRIPTION OF PLAINTIFF'S SUBMISSIONS & CITATIONS

**I.    Plaintiff's Combined Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment**

Plaintiff is opposing both motions for summary judgment in this combined memorandum of law. Hereinafter, he cites the memorandum of law by Defendant Jacobs as "J.Mo. at [x]," and the memorandum of law by the remaining defendants as "D.Mo. at [x]." To distinguish the moving parties, Plaintiff refers to Katrincic, Morales, Schrell, and Horun collectively as the "City Defendants," and identifies Jacobs by name.

The Defendants' exhibits attached to each of are similarly cited as either "J.Ex.[x]" (Jacobs' exhibits) or "D.Ex.[x]" (the City Defendants' exhibits).

**II.    Plaintiff's Responses to Defendants' 56.1 Statements**

Plaintiff has also combined his responses to Defendants' separate L.R. 56.1 statements. For clarity, these enumerated responses track the numbers on each of Defendants' submissions, followed by the letter associated with the relevant party. For example, Plaintiff's responses to Jacobs' 56.1 Statement are numbered as 1.J–89.J and respond sequentially to Jacobs' 89 points contained within his 56.1 statement. These paragraphs are cited herein as " J.[x]."

The same is done for the City Defendants, with Plaintiff's responses numbering 1.D–45.D, responding sequentially to the City Defendants' 45 points made within their 56.1 statement. These paragraph responses are cited herein as "D.[x]." Lastly, Plaintiff's 56.1 statement includes his own additional material facts, which are similarly numbered by list paragraph starting at 1.P, and are cited herein as " P.[x]."

**III.    Declaration of Robert Rickner and Attached Exhibits**

The declaration of Robert Rickner describes each of Plaintiff's Exhibits, which are cited herein as "Pl.Ex. [x]."

# TABLE OF AUTHORITIES

## CASES

*Ackerson v. City of White Plains*, 702 F.3d 15 (2d Cir. 2012).........................................9

*Ahern v. City of Syracuse*, 2006 WL 8453253 (N.D.N.Y. 2006) ..................................12

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) ..............................7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................7, 19

*Ashley v. City of New York*, 992 F.3d 128 (2d Cir. 2021) ...............................................9

*Claudio v. Sawyer*, 675 F. Supp. 2d 403 (S.D.N.Y. 2009),

    *aff'd*, 409 F. App'x 464 (2d Cir. 2011) .....................................................................21

*Collom v. Inc. Vill. of Freeport, N.Y.*, 691 F. Supp. 637 (E.D.N.Y. 1988)......................9

*Croft v. Greenhope Servs. for Women, Inc.*, WL 6642677 (S.D.N.Y. Dec. 17, 2013)................12

*Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991)....................................................10

*Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463 (E.D.N.Y. 2002).......................22

*Doe v. City of New York*, WL 3824133 (E.D.N.Y. Aug. 9, 2018) .................................13

*Dunn v. City of Syracuse*, 443 N.Y.S.2d 463 (1st Dep't 1981) ....................................12

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ..........8

*Gantt v. Cty. of Nassau*, 651 N.Y.S.2d 54 (2d Dep't 1996) .........................................13

*Grinols v. Beers*, 2021 WL 1246024 (W.D.N.Y. Apr. 5, 2021)....................................24

*Hearst v. City of New York*, 2012 WL 1019977 (E.D.N.Y. Mar. 26, 2012)...................23

*Hill v. City of New York*, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005).......................14

*Jaegly v. Couch*, 439 F.3d 149 (2d Cir. 2006).............................................................13

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) .............................................19

iv

*Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003) ........................................................... 10

*Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001) ........................................................ 10

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995)............................................................. 19

*Malin v. Hospira*, Inc., 762 F.3d 552 (7th Cir. 2014)............................................................. 8

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017)................................................................ 14

*McNamara v. City of New York*, 2009 WL 735135 (S.D.N.Y. Mar. 20, 2009)............................. 23

*Moore v. Comesanas*, 32 F.3d 670 (2d Cir. 1994)......................................................... 9

*Moroughan v. Cty. of Suffolk*, 514 F. Supp. 3d 479 (E.D.N.Y. 2021)...................... 11, 19, 20, 21

*Pangburn v.* Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) ....................................................... 14

*People v. Sanchez*, 45 Misc. 3d 55, 56

(N.Y. 1st Dept. App. Term 2014) ...................................................................... 13

*Pitchell v. Callan*, 13 F.3d 545 (2d Cir. 1994) ....................................................... 21, 22

*Randle v. Alexander*, 170 F. Supp. 3d 580 (S.D.N.Y. 2016) ........................................... 14

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir.1997)................................................. 14, 20

*Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)............................................................. 23

*Singer v. Fulton Cty. Sheriff*, 63 F.3d 110 (2d Cir. 1995) ........................................................ 10

*Tennessee v. Garner*, 471 U.S. 1 (1985)............................................................. 10

*Triolo v. Nassau Cty., NY*, 16-CV-2085 (AKT), 2019 WL 5742623

(E.D.N.Y. Nov. 4, 2019) ...................................................................... 11

*United States v. Classic*, 313 U.S. 299 (1941)............................................................. 21

*Weiner v. McKeefery*, 90 F.Supp.3d 17 (E.D.N.Y. 2015) ........................................................ 24

*West v. Atkins*, 487 U.S. 42 (1988) ...................................................................... 21

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ........................................................... 9, 18

*Wyatt v. Cole*, 504 U.S. 158 (1992) ............................................................................. 20

*Young Bai Choi v. D & D Novelties, Inc.*, 550 N.Y.S.2d 376 (2d Dep't 1990)............................ 23

*Zarkower v. City of New York*, 461 F. Supp. 3d 31 (E.D.N.Y. 2020)........................................... 10

**STATUTES**

42. U.S.C. § 1983 ............................................................................................................ 13, 14, 20

**OTHER AUTHORITIES**

McKinney Practice Commentary to Penal Law N.Y. Penal Law § 221.00 Effective July 5, 2014

    to March 30, 2021, William D. Donnino ................................................................................. 12

Plaintiff Steven Cooper ("Cooper") hereby submits the Memorandum in Opposition to the Motion for Summary Judgment filed by Defendant New York City Police Department ("NYPD") Lieutenant Thomas Jacob and the Motion for Summary Judgment by Defendants the City of New York, and NYPD officers Police Officer Nicholas Horun, Sergeant Adam Katrincic, Captain Desmond Morales, and Police Officer Jessica Schrell (together the "City Defendants").[1]

## PRELIMINARY STATEMENT

Cooper was attacked by Daniel O'Connor ("O'Connor") and Jacobs, an NYPD lieutenant on his day off. They chased him, threatened him, and Jacobs said he was going to shoot him with the gun he was carrying (his service weapon). But Cooper was able to distract Jacobs by swiping off his glasses, a clever self-defense move, and then ran away. They hunted Cooper down, found him, and pummeled him. Cooper called 911, and when the police came, Jacobs revealed he was an NYPD officer. Cooper was illegally taken into custody while the officers figured out what to do. Jacobs and the City Defendants soon hatched a plan to protect Jacobs by falsely accusing Cooper of being the assailant. And it worked. Cooper was prosecuted instead of Jacobs. But there was video. When Cooper found it, it proved that Jacobs had had lied repeatedly, the entire prosecution was unfounded, and Cooper was just an innocent victim. The charges were finally dismissed.

The two motions for summary judgement (Defendant O'Connor did not file one) should be denied. *First*, both motions rely on plainly disputed facts, some as simple as whether Jacobs punched Cooper or not (Cooper testified Jacobs did). There is no reason to consider the legal arguments if the factual basis for the motion is based almost entirely on disputes to be resolved

---

[1] Plaintiff agrees to dismissal of all claims against Officers Pearl Poon (Barnhart) and Sergeant Brendan Ryan, as well as Count VIII, which alleges Libel and Slander. This claim and these parties were not addressed in the pre-motion letter, but having reviewed the related arguments now, Plaintiff will not be opposing.

by a jury. *Second*, there was no probable cause to arrest Cooper at the scene. The City

Defendants pointedly claim that Cooper was not arrested until around 7:30 p.m., but Cooper was

not free to go beforehand. Further, the alleged probable cause was based on the entirely

unreliable, contradictory statements by Jacobs, made as part of a conspiracy to deprive Cooper of

his rights. This cannot form the basis for probable cause. *Third*, there is ample circumstantial

evidence of a conspiracy to have Cooper wrongly prosecuted. Indeed, it is the only likely

explanation for how Cooper, the victim, was prosecuted instead of Jacobs, the assailant. *Fourth*,

Defendants are not entitled to qualified immunity. The rights at issue here have been well

established for years and qualified immunity is never applicable when officers fabricate

evidence. *Fifth*, Jacobs was acting under color of law. He admitted he took actions as a police

officer, and could never have manufactured this conspiracy without this authority. *And finally*,

this Court should retain jurisdiction over the state claims, along with the federal claims, because

the federal claims should not be dismissed.

## STATEMENT OF FACTS

### a. The Assault on Steven Cooper

On March 20, 2016, Cooper was walking southeast toward the J-M-Z in Brooklyn, New

York. 1.P. As he was crossing the street at the crosswalk, Defendants' car blew the stop sign and

clipped Cooper on his right side. 1.P. Cooper told them to watch where they were going. 1.P.

Seconds later, the car stopped, and when Cooper glanced over his shoulder, he saw a car full of

adult men holding up their middle fingers in his direction. 4.P. Cooper shook it off and kept

walking. 5.P.

O'Connor jumped out of the vehicle and starting pursing Cooper, with Jacobs just a few

feet behind. 6.P. Cooper started walking faster and attempted to cross to the south side of

Broadway to get away from these two strangers who were following him. 6.P. But O'Connor

2

chased after Cooper, caught up, struck him in the head, grabbed him by the hood, and choked him—all while yelling and threatening him. 6.P–8.P. Jacobs soon caught up as well, and body checked Cooper, so Cooper could feel the gun he had hidden under his jacket. 9.P–11.P. Jacobs pushed Cooper several times, but did not knock him off his feet, and then threatened to shoot him. 12.P–13.P.  Cooper was afraid for his life. 12.P.

Cooper realized he needed to get away, so he took the tips of his fingers on his left (non-dominant) hand and swiped off Jacobs' glasses, spun around, and ran as fast as he could in the opposite direction. 15.P. O'Connor ran after Cooper with Jacobs following close behind. 17.P. As Cooper ran down Broadway, his hat fell off. 18.P. Jacobs, while chasing Cooper, attempted to grab the hat, but tripped and tumbled to the ground, landing flat on the right side of his face and on his right knee. 18.P. He slowly stood up, grabbed Cooper's hat, and kept following both men. 18.P–20.P.

When Cooper made it a few blocks and around a corner, thinking he had escaped his attackers, he stopped and called 911. 21.P–23.P. But while Cooper was still on the phone with 911, O'Connor, who was searching for Cooper, suddenly appeared. 22.P, 26.P. O'Connor started punching him, soon joined by Jacobs, who was also canvassing for Cooper in and out of the businesses in the area. 26.P. The attack, and Cooper's screams, can be heard on the 911 recording. 26.P–27.P.

**b.  The Police Response**

While Cooper was talking to 911, a radio transmission went out to officers in the area, including Horun and Schrell, who responded and arrived on the scene moments after the attack. 23.P.–25.P, 28.P. The radio run described an assault in progress by two men, and a FINEST message also stated that two guys tried to attack the caller, and included descriptions of the outfits they were wearing. 23.P.–25.P, 28.P–29.P. Horun and Schrell knew they were looking for

3

two assailants when they arrived, and told Cooper to jump in the back of their car to go search for them. 28.P–30.P. After a brief search, Cooper pointed out O'Connor and Jacobs walking away from where they assaulted Cooper, along with the other two men from the car, retired NYPD Sergeant Steven Mona and Vasilios Xydias. 30.P.

When Horun and Schrell exited the car, Jacobs flashed his identification at the officers and said that he was "on the job" as an NYPD officer. 31.P–32.P. After Katrincic, a supervisor, arrived on the scene, Jacobs told Katrincic, Horun, and Schrell what would be his first version of the incident—that there was an altercation, Cooper struck him, and so Jacobs struck him back. 34.P. Jacobs also admitted that he had his service weapon on him, which Katrincic later noted in a fitness for duty report. 44.P. While the group was talking, Cooper got out of the squad car in an effort to report what happened to him to the supervisor, but Horun ordered him to stay back. 33.P. Cooper asked if he was free to leave to tend to his wounds, but Horun told him no, that he had to go back to the precinct with them. 36.P–37.P.

### c. The Conspiracy to Frame Cooper

At the precinct, Katrincic notified the Internal Affairs Bureau ("IAB") and Desmond Morales, the Captain on duty, of the incident, stating that Jacobs was involved in an off-duty incident in which he struck Cooper in retaliation for Cooper first striking him. 34.P. During this time, Cooper was placed into the muster room where he repeatedly told Defendants that he wanted to go home, but they refused to allow him to leave. 39.P.–40.P. In the meantime, Jacobs was taken to an office, where he remained alone with Horun for two to three hours while the men discussed the incident—a discussion that was not recorded. 42.P. At one point, Morales came to the room and asked Horun to step out while he spoke with Jacobs alone. 42.P.

It was only after these private discussions between Horun, Morales, and Jacobs that the story changed, and a new narrative emerged. Jacobs now claimed that the entire incident started

when Cooper threw something at the car, causing O'Connor to get out and confront Cooper. 9.J; 2.P–3.P. According to this narrative, Jacobs went to intervene to stop the situation from escalating, but Cooper was increasingly "aggressive," even when O'Connor supposedly backed down. 13.J–17.J. Jacobs then claimed that, while he was trying to separate his O'Connor from an enraged Cooper, Cooper sucker punched him with a closed fist, causing Jacobs to fall to the ground, black out, and see stars. 26.J; 16.P. Morales, Katrincic, Horun, and Schrell quickly adopted this version of events and began preparing their reports to reflect this false narrative.

During the feigned investigation in the hours following the assault, Morales recorded interviews with Xydias, Mona, Katrincic, Horun, Schrell, and Jacobs. 70.J–71.J; 22.D; 48.P–49.P. But no one ever formally interviewed Cooper, and the interview with O'Connor was not recorded. 48.P–49.P. In the meantime, Katrincic, Schrell, and Horun processed paperwork to support Jacobs' story, and Schrell formally arrested Cooper for assaulting Jacobs. 41.P–52.P. But the Defendants made significant mistakes during this thrown-together cover up that would eventually prove Cooper's innocence. For example, Katrincic had already told IAB that Jacobs struck Cooper, but he proceeded as if that report never existed after the Defendants agreed upon the best version of events. 34.P–35.P. Additionally, when filling out a fitness for duty report for Jacobs, Katrincic marked a box indicating that Jacobs was armed during the incident, which substantiates Cooper's claim that he "felt steel" when Jacobs body checked him in the street. 11.P, 38.P, 44.P–45.P. Morales, in contrast, left the armed status blank on his assessment, which he now admits was improper to leave out. 50.P–51.P. Defendants also failed to collect numerous pieces of security footage from the scene, despite claiming to have done a thorough canvass. 25.D; 46.P–47.P.

The Brooklyn North Investigations Unit, which handles investigations referred to them by the IAB, started interviewing the witnesses. But before the initial investigation was complete, Morales wrote a UF-49 letter to IAB about the incident, as required by department protocol, intentionally omitting the fact that Cooper had been badly, visibly injured, and omitting that Cooper specifically told Morales that Jacobs was responsible for his injuries as one as one of the two attackers. 50.P.–52.P. And Jacobs lied about how he got his injuries, attributing the redness to his face and abrasions to his knee to the alleged punch by Cooper, further claiming that he was throwing up that night as a result of being knocked out when he was hit "harder that [he] ever had in his life." 15.P–19.P, 55.P. In truth, Jacobs' only injuries occurred when he tripped and fell while chasing after Cooper. 18.P.

Cooper vehemently protested Defendants' version of events and told the Defendants that they needed to record his complaint and pursue charges against both O'Connor and Jacobs. But the City Defendants refused, omitted Cooper's complaints against Jacobs from their official paperwork, minimized Cooper's injuries, and told the Kings County District Attorney's Office that Cooper was the assailant, not the victim. 41.P–52.P, 56.P. When Schrell formally arrested Cooper at the precinct (after he was already in a holding cell), Cooper voluntarily told the officer that he had a small quantity of marijuana on him, which was taken as part of the vouchering process. 31.D; 43.P. Hours later, Cooper was released with a Desk Appearance Ticket charging him with assault and requiring him to appear in criminal court to answer for the false charges. 83.J–84.J; 56.P.–60.P.

### d.  The Prosecution Against Cooper

On April 20, 2016, a month after Cooper was assaulted, Assistant District Attorney ("ADA") Sean Hughes was assigned to screen the allegations Jacobs made against Cooper and decide what, if any, charges should proceed against Cooper. 57.P. ADA Hughes interviewed

Jacobs twice, during which Jacobs lied about being punched in the face by Cooper with a closed fist, causing bruising, swelling, and redness. 58.P. These lies, which were supported by the documents prepared by the City Defendants, were the only source of information available to Hughes when deciding to charge Cooper with multiple misdemeanors, including assault. 59.P–60.P. Jacobs then signed a sworn supporting deposition allowing the case to move forward. 60.P. At his deposition, ADA Hughes explained that if he had known the truth about what happened, Cooper may not have been charged at all. 59.P–61.P.

Cooper eventually procured a wealth of surveillance footage from the area—the very footage that Defendants claimed to have searched for to no avail. 46.P–47.P, 61.P. The footage confirmed that Cooper was telling the truth and that O'Connor and Jacobs instigated the entire altercation, contradicting Jacobs' sworn statement as well as the City Defendants' reporting. 61.P.  As a result, the DA's office dismissed all charges against Cooper because he was the victim, not the assailant, which then triggered further investigation by the IAB into Jacobs' involvement in the assault on Cooper. 61.P–63.P.

## ARGUMENT

I.      **Defendants completely ignore the summary judgment standard and most of their arguments rely on facts that are obviously in dispute.**

The summary judgment standard is so well known it scarcely warrants repeating: Summary judgment is not a chance for the parties to make arguments about how to "weigh the evidence and determine the truth of the matter" but rather for the judge "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In this analysis the court must "resolve all ambiguities in favor of the nonmoving part[y]." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). And obviously, the Defendants cannot claim disputed facts are actually undisputed "on the hope that neither the district court nor

[an appellate court] would take the time to check the record." *Malin v. Hospira*, Inc., 762 F.3d 552, 564 (7th Cir. 2014) (warning litigants not to waste the court and opposing parties' time with this bad faith tactic).

But Defendants have done this anyway. Jacobs claims that "Cooper punched Jacobs on the right side of his face." 26.J. But Cooper denies this and the video supports Cooper's testimony that he used his left (non-dominant) hand to swipe off Jacobs' glasses so he could run away. *Id*. This fact can hardly be deemed undisputed. Jacobs claims that after O'Connor had hunted down Cooper, he remained "at all times approximately twenty feet away from Cooper." 49.J. But Cooper specifically testified that Jacobs joined O'Connor in the attack. *Id*. There is no justification for telling this Court that it is undisputed that Jacobs was 20 feet away when Cooper testified that Jacobs punched him. At the precinct, Jacobs says he was "alone in the office" for three hours, even though Horun testified he was in the office with him (developing the conspiracy, Plaintiff alleges). 70.J. And the City Defendants claim that "Jacobs's injuries, including pain to his face, from the assault were also documented in his Aided Card." 29.D. But Cooper denies punching Jacobs, and Jacobs' injuries can be readily explained by him tripping and falling on his face, which is caught on video. *Id*.

Defendants have the burden of proving that there is "no genuine issue respecting any material fact." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). They have not met this burden. Cooper's detailed 56.1 Statement proves that key facts supporting the two summary judgment motions are in dispute, so this Court need not even consider Defendants' legal arguments. Their motions are improperly based on disputed facts.

II.   **There are disputes of material fact as to whether there was probable cause to arrest Cooper, so the motion to summarily dismiss the false arrest claims, under both state and federal law, should be denied.**

   a.  **Legal Standard**

"A § 1983 claim for false arrest, rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The federal cause of action "is substantially the same as a claim for false arrest under New York law." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) (quoting *Weyant*, 101 F.3d at 852). The only element of the claim at issue here is whether the "confinement was not otherwise privileged." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quotation omitted).

Summary judgment on a false arrest claim is only appropriate "'if there is no dispute as to the pertinent events and the knowledge of the officers'" leading up to the confinement. *McKenzie*, *supra* at *6 (quoting *Weyant*, 101 F.3d at 852). When the arrest is without a warrant, the defendants have the burden of proof. *See, e.g., Collom v. Inc. Vill. of Freeport, N.Y.*, 691 F. Supp. 637, 640 (E.D.N.Y. 1988) ("Because the alleged arrests were warrantless, defendants bear the burden of this showing by a preponderance of the evidence."). Where an issue of probable cause is factual in nature it must be presented to a jury. *See Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994); *Collom*, 691 F. Supp. at 640 ("[W]here the evidence is conflicting such that reasonable persons might draw differing inferences, then the question of probable cause is ordinarily for the jury to decide.").

   b.  **There Was No Probable Cause to Arrest Cooper at the Scene**

Jacobs does not even move for summary judgment on the state or federal false arrest claims, except to argue that all the federal claims should be dismissed because Jacobs was not acting under color of law, which is addressed below. The City Defendants argue that there was

9

probable cause to arrest Cooper "between approximately 7:30 and 7:32 p.m." D.Mo.3. But Cooper was arrested hours earlier, when he was told he was not free to leave, and was forced to go to the precinct. 36.P–37.P, . There is a Fourth Amendment seizure whenever "an officer restrains the freedom of a person to walk away." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Thus, Cooper was arrested as soon as the officers stopped him from walking away and tending to his wounds.

The City Defendants cannot justify their arrest by claiming they needed to detain Cooper to question him or to decide whether to arrest him. This is plainly unconstitutional, and patently unreasonable, to detain someone "for the purpose of gathering additional evidence to justify the arrest." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see also Zarkower v. City of New York*, 461 F. Supp. 3d 31, 42 (E.D.N.Y. 2020) (explaining why, under clearly established law, it is unconstitutional to detain someone for questioning).

The City Defendants also cannot justify the arrest by claiming that Cooper is seen on video swiping Jacobs' glasses off. Cooper was defending himself from an attack. O'Connor and Jacobs were threatening him, and Jacobs had a gun while threatening to shoot Cooper. 7.P–13P. On this version of the facts—*i.e.* what really happened—Cooper's actions "were not criminal" because he was "acting in self-defense" and "a jury could therefore find that the arrest lacked probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003).

Finally, the City Defendants cannot justify the arrest by claiming that Jacobs' statements gave the other officers probable cause to arrest Cooper. Accusations by a victim can establish probable cause, but only when there are no reasonable doubts "as to the victim's veracity." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). And an officer cannot "disregard plainly exculpatory evidence." *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001)

(quotation omitted). For example, in *Triolo v. Nassau Cty., NY*, the court denied a motion to set aside a verdict because the there was objective evidence that the alleged victim was not credible, including a note in the paperwork that no crime was committed. 16-CV-2085 (AKT), 2019 WL 5742623, at *4 (E.D.N.Y. Nov. 4, 2019).

The City Defendants had ample evidence available to them indicating that Jacobs was not telling the truth. Cooper called 911 and stated, in sum and substance, that *two* men jumped out of a car, started chasing him, threatened him, and assaulted him. 21.P, 23.P–25.P, 28.P–29.P. Cooper is much smaller than the O'Connor and Jacobs, and immediately pointed out his attackers to the responding officers. 30.P. When he reported the incident to the IAB at 4:30 p.m. that day, Katrincic specifically stated that Jacobs admitted that he had struck Cooper, and Cooper had visible bruising on his face. 27.P, 34.P. The City Defendants testified that they initially considered Cooper the victim of an assault, and they still deny arresting Cooper until hours after he was initially detained and told he had to go to the precinct—a stark admission there was no probable cause before Cooper was already taken into custody. 28.P–30.P, 65.J, 75.J–76.J

Recently, in an analogous decision, Circuit Judge Joseph F. Bianco, ruling on a case he retained from when he was as a district court judge in the Eastern District, found triable issues of fact regarding whether officers who arrested the plaintiff had reason to doubt the veracity of a fellow officer's account of his off-duty altercation with the plaintiff. *Moroughan v. Cty. of Suffolk*, 514 F. Supp. 3d 479, 511 (E.D.N.Y. 2021). "[E]ven if not involved in the decision to arrest or charge plaintiff, there is evidence that would allow a rational jury to infer that one or more of these individual [officers] were aware that [the off-duty officer's] version of events was highly questionable based upon information they acquired from their own investigation and observations and/or what they learned from fellow officers." *Id.*at 521. Here, the facts available

11

to the officers demonstrate that Jacobs was changing his story and was lying about hitting

Cooper—and he did so under the protection of his fellow officers—meaning that each of the City

Defendants can be held liable for Cooper's false arrest as well. *Id.* at 517 ("Where an individual

instigates an arrest and does so based on knowingly false information, that individual may be

held liable for false arrest."); *see also Croft v. Greenhope Servs. for Women, Inc.*, WL 6642677,

at *5 (S.D.N.Y. Dec. 17, 2013) ("Under New York law, '[o]ne who wrongfully accuses another

of criminal conduct and induces or procures that person's arrest may be liable for false arrest.'")

(*quoting Dunn v. City of Syracuse*, 443 N.Y.S.2d 463, 464 (1st Dep't 1981)).

The City Defendants have not met their dual burdens of proving the arrest was based on

probable cause, and of proving there is no material dispute of fact to show otherwise, so their

summary judgment motion should be denied.

### c.  Marijuana Possession Was Not a Crime, So It Cannot Justify an Arrest

Possession of small amounts of marijuana, like the joint at issue here, was decriminalized

in New York in 1977:

> The "Marihuana Reform Act of 1977" excluded marihuana, other than
> "concentrated cannabis," from the definition of the crimes dealing with controlled
> substances in Penal Law article 220, and created this separate article to define
> offenses related to the sale and possession of marihuana. L.1977, c. 360. The
> purpose of the Act was to reduce the penalties for possession and sale of marihuana
> and in particular to "decriminalize" the possession of a small amount of marihuana
> for personal use. … "The legislature finds that arrests, criminal prosecutions and
> criminal penalties are inappropriate for people who possess small quantities of
> marihuana for personal use."

N.Y. Penal Law § 221.00 (McKinney Practice Commentary to Penal Law Effective July 5, 2014

to March 30, 2021, William D. Donnino); *Ahern v. City of Syracuse*, 2006 WL 8453253, at *11

(N.D.N.Y. 2006) (explaining that an "unlawful possession of marihuana charge does not permit a

custodial arrest" and instead a ticket should be issued on the scene).

12

Certainly, an arrest is authorized when there is probable cause to believe someone "has committed or is committing a *crime*." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (emphasis added). But marijuana possession has not been a crime in New York since 1977, unless it is displayed in public view. *See People v. Sanchez*, 45 Misc. 3d 55, 56 (N.Y. 1st Dept. App. Term 2014) (finding that having marijuana in your pants pocket is not "criminal possession"). The City Defendants cannot arrest Cooper for something that is not a crime. Further, searching Cooper while he was in custody is a violation of his Fourth Amendment rights if, as shown here, there was no probable cause to detain him in the first place. And "a civil defendant cannot raise a defense of probable cause to a false arrest claim if the arrest was the result of an initially unlawful search or seizure." *See Doe v. City of New York*, WL 3824133, at *4 (E.D.N.Y. Aug. 9, 2018) (citing *Gantt v. Cty. of Nassau*, 651 N.Y.S.2d 54, 542 (2d Dep't 1996)).

Finally, Defendants readily admit that they do not know *when* Cooper was arrested in relation to his voluntarily production of a small amount of marijuana from his pocket. D.Mo. at 9 ("it is unclear whether this marijuana was found before or after plaintiff was charged with assault."). But Cooper testified that the officers did not find the marijuana until he was already being booked on other charges, so even if marijuana could justify a custodial arrest, the time in custody beforehand was still unlawful.

### III.   There is enough circumstantial evidence of a conspiracy to have Cooper wrongfully prosecuted to create an issue of fact for the jury.

#### a.   Legal Standard

To prove a conspiracy under 42. U.S.C. § 1983, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal

13

causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). The Second Circuit has made clear that "conspiracies are by their very nature secretive operations," and may therefore be proven with circumstantial evidence. *Id*. To survive a motion for summary judgment, "a plaintiff's evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016) (plaintiff's circumstantial evidence suggesting that the defendants coordinated a false version of events to inculpate the plaintiff precludes summary judgment). If a "rational jury may infer rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on plaintiff's conspiracy claim." *Hill v. City of New York*, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir.1997)).

There is ample circumstantial evidence here demonstrating that the City Defendants agreed with Jacobs to have Cooper prosecuted based on false information, and without probable cause, to cover up Jacobs' unconstitutional acts and further deprive plaintiff of his Fourth, Fifth, and Fourteenth Amendment rights. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918–19 (2017) (finding that it is a violation of the Fourth Amendment to cause someone to be prosecuted without probable cause and based on false information); *Ricciuti*, 124 F.3d at 130 (finding that it is a violation of due process to cause someone to be prosecuted based on fabricated evidence, regardless of whether there is probable cause).

### b.  Circumstantial Evidence of the Conspiracy Creates Triable Issues of Fact

The facts here are stark. Cooper was a victim, defending himself against O'Connor and Jacobs. Jacobs is a proven liar. His claim he was punched so hard by Cooper, who is tiny in comparison, that he fell down and suffered a concussion is plainly contradicted by the video.

14

15.P–16.P, 18.P. Cooper was visibly injured. 27.P. Cooper told the City Defendants that Jacobs attacked him. But Jacobs, after talking with all the other officers, was never charged with a crime, while the victim, Cooper, was charged with assault. This was a conspiracy.

*First*, Cooper gave an accurate description of O'Connor and Jacobs to the 911 operator and identified both men as his attackers. 21.P, 23.P–25.P. Cooper described his first assailant as a white male wearing Khaki pants, a black fleece jacket, and a hat (matching Jacobs' appearance on the date in question), and the second as a at least six feet tall, wearing jeans and a jacket (describing O'Connor). 23.P–24.P. This information was transmitted over the radio run to the responding officers, Horun and Schrell, and was readily available to all of the officers involved in the investigation through the Sprint report and internal FINEST messages which are generated automatically when a 911 call is made. 28.P–29.P. Cooper immediately pointed out his attackers to Horun and Schrell after they told him to get into their squad car. 30.P. And when Cooper attempted to get out of the squad car and find out what the officers were discussing with his assailants and one another, Horun ordered Cooper to get back and stay away. 33.P. Nevertheless, the City Defendants denied that Cooper ever even accused Jacobs of assaulting him—a fact completely unsupported by the documentary evidence.

*Second*, when Katrincic called IAB around 4:30 p.m. to report the assault, he told the IAB officer that Jacobs admitted that he did, in fact, strike Cooper. 34.P. Katrincic also informed IAB that he forwarded this information to Morales. *Id*. But as soon as Jacobs was back at the precinct and was alone in an office with Horun for hours, the story changed, and the responding officers fell in line behind their superiors, adopting Jacobs' new version of events.[2] 35.P, 42.P.

---

[2] A reasonable jury could also easily infer that Jacobs admission that he struck Cooper—something that Cooper has always maintained happened during the *second* attack, of which there is no video footage—was an admission to the very assault that Plaintiff reported. In the surveillance footage (Pl.Ex. 20 and 22)**,** it is clear that Plaintiff swipes off Jacobs' glasses and runs away, and both O'Connor and Jacobs chase Cooper out of view of the camera. There is no

Instead of admitting to striking plaintiff in a mutual altercation, the narrative turned into one of Cooper attacking Jacobs—a safer bet than further memorializing the admission made to Katrincic.

*Third,* despite Katrincic telling Morales what happened, and despite Morales' own testimony that Cooper specifically identified Jacobs as one of his attackers, Morales made an intentional decision to omit this fact in the UF-49 report to the IAB under the guise of having conducted a "thorough investigation" which, according to Morales, conclusively determined that Jacobs did not assault Cooper. Mo. at 11; 34.P–35.P, 39.P, 41.P, 49.P–52.P. But no such investigation took place, and Morales already knew of the confession that Jacobs made to the responding officers, yet he omitted the information from the UF-49 anyway. *Id.*

*Fourth*, while Defendants claimed that there was a video canvass with negative results, none of them can identify who actually canvassed the area. 46.P–47.P. Of course, the footage did exist, and it clearly shows that Jacobs lied about what happened. This is more than sufficient circumstantial evidence for a reasonable jury to infer that the officers either (1) lied about canvassing and avoided doing so to protect Jacobs; or (2) discovered footage confirming Cooper's story and intentionally chose not to collect or report it. *Id.*

*Fifth*, Defendants also worked together to hide the fact that Jacobs was carrying his firearm, further substantiating Cooper's allegations. 44.P–45.P. When filling out Jacobs' fitness for duty report, Katrincic marked a box indicating that Jacobs *was* carrying his firearm on the date in question, while Jacobs maintains that he was unarmed that day. 44.P. At his deposition, Katrincic's only explanation for this inconsistency was that he "misspoke" when he filled out the

---

footage directly showing Jacobs attacking Plaintiff—so Jacobs' admission to Katrincic further substantiates Plaintiff's allegations that both O'Connor *and* Jacobs participated in the assault around the corner from the intersection.

form, despite being the very officer who supposedly called Jacobs' command and confirmed that Jacobs' firearm was in his precinct locker. *Id.*. Katrincic, however, failed to note anywhere in any of his paperwork who he actually spoke to and what time the call took place, and he could not provide either piece of information during his deposition. *Id*. Katrincic could only  speculate that he may have marked the "armed" box on the fitness for duty report because Jacobs was allowed to carry a firearm, not because he was carrying one that day. *Id*. A reasonable jury could easily discredit this version of events and infer from the absence of any written documents memorializing the conversation, and presence of the checked "armed" box on the fitness for duty report—that the call to Jacobs' command never actually took place because Jacobs did have his weapon, and the City Defendants were working together to cover that fact up.

*Sixth*, the officers attempted to downplay Cooper's injuries because they did not want to attribute them to Jacobs. 27.P, 41.P. Oddly, Defendants argue that, because a version of Cooper's injuries were reported, that this fact somehow demonstrates that the City Defendants "had nothing to hide." D.Mo. at 11. But it is unclear how attributing Cooper's injuries to O'Connor, not Jacobs, leads to the conclusion that the City Defendants were not hiding pertinent information about what happened; if anything, the fact that Cooper's injuries were attributed solely to O'Connor—along with their refusal to take photos of Cooper's black eye—is further circumstantial evidence that Defendants refused to implicate Jacobs because they tacitly or overtly agreed to adopt Jacobs' version of events and were assisting him in covering up his wrongdoing.

*Seventh*, Jacobs was not just an ordinary NYPD lieutenant. He was, and is, an Integrity Control Officer ("ICO"). In the 1970s, the Knapp Commission was empaneled to investigate the widespread corruption revealed by NYPD officer Frank Serpico. In response to the harsh

17

criticism by the Commission, the NYPD created the ICOs to act as the eyes and ears of the IAB

in individual precincts.  65.P. The ICOs are trained by and work with the IAB to reduce police

corruption. Jacobs, therefore, had an intimate knowledge of the IAB and was uniquely suited to

organize the conspiracy to have Cooper arrested to cover up the attack. *Id.*

*And finally*, Cooper was not charged until after he said that he wanted to press charges

against Jacobs and O'Connor. 75.J, 43.P. The City Defendants, and Jacobs, were apparently

ready to let Cooper go. But after Cooper told an officer that he was going press charges, meaning

he was not going to pretend he was never assaulted, the officer left, came back, and told Cooper

that they were going to press charges against him as well.[3] 75.J, 43.P A jury could find that the

charges were a retaliation for Cooper's unwillingness to pretend the assault never happened.

Thus, rather than conduct a "thorough investigation," as they now claim, the City

Defendants simply *agreed* on which version of events they were going to forward to various

higher ups and the prosecutors, and did so with the intent and result of having Cooper

prosecuted, rather than Jacobs, a fellow officer, in violation of Cooper's Fourth, Fifth, and

Fourteenth Amendment rights. The factual disputes present in these examples are almost entirely

credibility determinations, which means they must be resolved by a jury. *See Amnesty Am.*, 361

F.3d at 122 ("The Court 'is not to weigh the evidence but is instead required to view the

evidence in the light most favorable to the party opposing summary judgment, to draw all

reasonable inferences in favor of that party, and to eschew credibility assessments.'") (*quoting*

*Weyant*, 101 F.3d at 854 (2d Cir.1996)).

---

[3] Of course, the victim does not get to decide whether charges are brought or not, which makes this interaction even more suspect. Certainly the officers knew that Cooper had no control over whether Jacobs was prosecuted or not, but they also knew that Cooper, a lay person, probably did not know that. So they used this ignorance to give Cooper the option of staying quiet. But Cooper was not willing to do that, and was prosecuted as a result.

And again, the facts here are quite similar to the facts *in Moroughan v. Cty. of Suffolk*. 514 F. Supp. 3d 479 (E.D.N.Y. 2021). There, the court found a triable issue of fact as to whether there was a conspiracy. The defendants omitted details that favored the plaintiff from their paperwork, left out details that tended to inculpate a fellow officer, and lied about what the plaintiff had said in custody. *Id*. at 533-537. Taken together, this circumstantial evidence was enough to require a trial. The same is true here.

## IV.    Defendants are not entitled to qualified immunity.

Defendants argue that they are entitled to qualified immunity on Coopers' false arrest and imprisonment claims because there was "arguable probable cause" to arrest. But "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (citing *Anderson v. Creighton*, 483 U.S. 635, 644 (1987)). The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed." *Id*. If the undisputed facts demonstrate that "the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims." *Id*. at 88. "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995).

Defendants cannot rely on a mistake of law or fact here, as each officer—Katrincic, Horun, Schrell, and Morales—was informed of Jacobs' admission that he hit Cooper, had multiple reasons to doubt the veracity of any claim that Cooper was the aggressor, and actively worked to falsely implicate Cooper and cover up Jacobs' assault of a civilian. Contrary to Defendant's argument, the relevant fact here is not that Cooper was innocent of the allegations

19

(which he was), or that the officers were "mistaken," but that the information that purportedly made up the probable cause necessary to arrest Cooper was fabricated—and the Defendants knew it. D.Mo. at 14–15; *See, e.g. Ricciuti*, 124 F.3d at 130 (qualified immunity unavailable were officers allegedly forwarded false information implicating the plaintiff). Or, at a minimum, each of the Defendants had every reason to question Jacobs' veracity, undermining the sole source of any probable cause against Cooper, which would have been conclusively disproven if a proper investigation was conducted. *See Weiner v. McKeefery*, 90 F. Supp. 3d 17 (E.D.N.Y. 2015) (probable cause "dissipate[s] when police officers fail to examine evidence already available to them."); *see also Moroughan*, 514 F.Supp.3d at 541 (denying qualified immunity upon the existence of disputed issues of fact regarding the defendants' participation in fabricating evidence to protect a fellow officer who made claims that were obviously and patently false."). Defendants are therefore not entitled to qualified immunity on the false arrest claim.[4]

## V.    Jacobs was acting under color of law.

### a.   Legal Standard

The Supreme Court describes the 42 U.S.C. § 1983 as a protective mechanism meant to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights[,] and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "The central question in examining the 'under color of state law' requirement [of § 1983] is whether the alleged infringement of federal rights is 'fairly attributable to the State.'" *Moroughan*, 514 F. Supp. 3d at 511 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). It is firmly established that an officer "acts under color of state

---

[4] Because Defendants only addressed qualified immunity for Plaintiff's false arrest claim (as well as the defamation claim Plaintiff agrees to dismiss), they have waived any additional QI arguments they may attempt in a reply.

law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 50 (1988); see also *United States v. Classic*, 313 U.S. 299, 326 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.").

The inquiry into the nature of the Jacobs' actions is a factually specific one that must be viewed in the totality of the circumstances surrounding the incident. *See Moroughan*, *supra* at 512. The court must "look to the nature of the officer's act, not simply his duty status." *Id*. If an officer invokes the "real or apparent power of the police department," or "performs duties prescribed generally for police officers," he has acted under color of law. *Id*.; *see also Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994) ("Liability [] may exist where off-duty police officers perform duties prescribed generally for police officers.").

### b. Analysis

Jacobs wrongly asserts that because he was off duty, out of uniform, did not identify himself as an officer prior to assaulting Cooper, and was not the person who physically placed cuffs on Cooper, that this Court should conclude that he was not acting under color of his authority as a police officer. J.Mo. at 11–12. But this is not the test. Those enumerated examples provided in Jacobs' motion are merely considerations for the court; they are not, as Jacobs suggests, dispositive to § 1983 liability. J.Mo. at 12 (summarizing the *Cotz* factors). Instead, courts should look to the "totality of the circumstances surrounding the officer's acts." *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 464 (2d Cir. 2011). Relevant here are those steps Jacobs took that are "generally prescribed for police officers," viewed in light of "the nature of the officer's conduct and the relationship of the conduct to the officer's official duties." *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 475 (E.D.N.Y.

21

2002) (citing *Pitchell*, 13 F.3d at 548). Jacobs engaged in a series of steps constituting police

action, exposing him to liability on all of Cooper's § 1983 claims, not just false arrest.[5]

*First*, Jacobs voluntarily entered into a dispute between two private parties—O'Connor

and Cooper—under the guise of preventing the commission of a crime. 18.J; 14.P. He used his

NYPD issued firearm to assert authority over Cooper, threatening further violence if Cooper did

not stand down against O'Connor. 11.P–12.P. And when Cooper tried to run away from the men

who he reasonably believed were trying to rob him, Jacobs chased him, picking up Cooper's hat

from the sidewalk as he ran, a tactic he personally attributed to his NYPD training. 15.P, 18.P–

20.P. Jacobs then participated in a canvass of the area for the "suspect," looking for Cooper in a

bank and nearby bodega. 22.P. When O'Connor finally spotted Cooper, O'Connor and Jacobs

purposefully detained Cooper and prevented him from leaving, punching and beating him until

his eye was black and blue, leaving only after they realized Cooper was on the phone with 911.

26.P–27.P.

*Second*, after violently assaulting Cooper, Jacobs flashed his NYPD identification to the

responding officers and stated he was "on the job." 32.P.[6] Jacobs then used his power and

authority as a police officer to enlist the help of his fellow officers in adopting a fantastical story

in which Jacobs was heroically attempting to intervene in a private dispute and prevent the

commission of a crime, just as he was trained to do. 18.J; 14.P, 34.P–35.P. The City

Defendants—at the direction of Jacobs, a fellow officer—then conspired to fabricate evidence

---

[5] Despite the section title stating otherwise, Jacobs' motion appears only to address the color of law analysis with regard to Plaintiff's federal false arrest claim, not the remaining constitutional torts, including conspiracy to deprive Plaintiff of his constitutional rights. In the body of his argument, Jacobs only disputes issues related to Plaintiff's arrest and confinement, not Jacobs' subsequent fabrications of evidence and wrongful prosecution of Plaintiff. Jacobs has therefore waived any such argument at this stage, and cannot move on additional grounds in a reply.

[6] Notably, there is no requirement that Cooper have express or actual knowledge of Jacobs' status as a police officer prior to the dispute; the operative question is whether Jacobs used the power of the state to engage in unconstitutional conduct, not if Plaintiff knew that an officer was wielding such power against him.

against Cooper, leading to Cooper's wrongful prosecution. Jacobs used his authority to enlist the other officers to protect his false version of events, and he did so with the knowledge and purpose of depriving him Cooper of meaningful due process an attendant constitutional rights. Jacobs also used his status as an officer to gain credibility with the prosecution, signing a sworn supporting deposition which falsely accused Cooper of criminal assault. 56.P–60.P.

*Third*, Jacobs requested and was granted overtime payment for the hours he was involved in the assault on Cooper and the subsequent investigation. 54.P. He also requested reimbursement for unpaid time off by submitting a line of duty injury report months after the incident, which was subsequently denied because when he was found to have acted inappropriately in instigating the altercation. 55.P.

Put simply, the only reason Jacobs could have put this scheme into place is because he was an NYPD lieutenant. Without this authority, the color of law, Jacobs would have been arrested and Cooper would have been free to go.[7]

Finally, Jacobs reliance on an unpublished decision is misplaced. *McNamara v. City of New York*, 2009 WL 735135, at *3 (S.D.N.Y. Mar. 20, 2009); J.Mo. at 15. In *McNamara*, the off-duty officer assaulted a civilian before taking out his gun, pointing it at the plaintiff, and identifying himself as a police officer with his badge. *Id*. at *1–2. While the court granted partial summary judgment based on these facts, they did so only for the plaintiff's excessive force

---

[7] It should be noted that the question of whether an officer was acting within the scope of his employment, and thus the employer is liable under the doctrine of *respondeat superior*, is alsogenerally one reserved for a jury. *See Young Bai Choi v. D & D Novelties, Inc.*, 550 N.Y.S.2d 376, 377 (2d Dep't 1990) (citing *Riviello v. Waldron*, 391 N.E.2d 1278 (N.Y. 1979)). This court has previously found that, where the NYPD pays an officer for the time that he was involved in an allegedly off-duty incident, the employer essentially ratifies the conduct and opens itself up to *respondeat* liability. *Hearst v. City of New York*, 2012 WL 1019977, at *6 (E.D.N.Y. Mar. 26, 2012) ("[T]he undisputed evidence in the record that [the officer] was paid overtime for the period during which the shooting occurred supports the conclusion that the jury, and not the court, must decide whether [he] was acting within the scope of his employment.") A reasonable jury could similarly find that "[t]he NYPD ratified [Jacobs'] actions by finding that he was on duty and paying him overtime for the time encompassing the [incident], and that [Jacobs] therefore was acting within the scope of his employment." *Id*.

claim. *Id*. at *3. The court denied summary judgment on the false arrest claim under the same facts, making clear that the defendant's false reports to the responding officers, which in turn caused the false arrest and prosecution of the plaintiff, constituted actions taken under color of law. *Id*. at *4.

Further, because Jacobs' false statements were made with the intent to have Cooper falsely arrested and prosecuted and to cover up his own wrongdoing, Jacobs can be held responsible violating Cooper's rights. *See Grinols v. Beers*, 2021 WL 1246024, at *9 (W.D.N.Y. Apr. 5, 2021) (citing *Weiner v. McKeefery*, 90 F.Supp.3d 17, 45–46 (E.D.N.Y. 2015) (a person "can be found to have acted under color of law  . . . when he acts in concert with, or participates in joint activity with state actors, or knowingly provides state actors with false information, to induce them to act.").

**VI.     This Court should continue to exercise jurisdiction over the state law claims.**

The only substantive arguments that the Defendants have made regarding the state law claims are related to the false arrest claims, which are identical to the federal claims for the purpose of this motion, and the defamation claim, which is not being opposed. Otherwise, the only argument is that this Court should decline to exercise supplementary jurisdiction over the state claims after the federal claims are dismissed. But, as demonstrated above, the federal claims should not be dismissed, and thus the related state claims should remain in this Court as well.

If this Court wishes to *sua sponte* address the substance of any state law claims, not addressed by Defendants, we ask for the opportunity to submit additional briefing to address any issues the Court believes need to be considered.

## CONCLUSION

For the reasons stated above, the Defendants' motions for summary judgment should be denied.

Dated:  New York, New York
       September 3, 2021

Rickner PLLC

By:      /s/

       Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401


Yitzchok Kotkes, Esq.
LAW OFFICES OF YITZCHOK KOTKES, P.C.
225 Franklin Ave Ste 325
Garden City, NY 11530

*Attorneys for Plaintiff*

25